No. 02-639

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 395

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

TANYA MARIE ANYAN,
JAY CLEVELAND, AND TROY KLEIN,

        Defendants and Appellants.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and for the County of Sanders, Cause No. DC 00-44, 48, and 50
The Honorable C.B. McNeil, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

        Kristina Guest, Appellate Defender Office, Helena, Montana (attorney for Klein); John O. Putikka, Attorney at Law, Thompson Falls, Montana (attorney for Anyan); Carolyn S. Gill, Attorney at Law, Plains, Montana (Attorney for Cleveland)

        For Respondent:

        Honorable Mike McGrath, Montana Attorney General, John Paulson, Assistant Attorney General, Helena, Montana; Robert Zimmerman, Sanders County Attorney, Thompson Falls, Montana

Argued: September 11, 2003
Submitted: September 25, 2003
Decided: December 30, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Appellants Tanya Marie Anyan, Jay Cleveland, and Troy Klein were each convicted of drug-related felonies in the District Court for the Twentieth Judicial District, Sanders County, after pleading guilty to the charges pursuant to a plea agreement. We reverse and remand for further proceedings consistent with this Opinion.

¶2 We address the following issue on appeal: Whether law enforcement officers' no-knock entry into Appellants' house to execute a search warrant violated Appellants' constitutional rights to privacy and to be free from unreasonable searches and seizures.

**Factual and Procedural Background**

¶3 In late May 2000, Officer Christopher Nichols of the Thompson Falls Police Department was assigned to investigate suspected illegal drug activity occurring at a rented house in Thompson Falls. During the course of the investigation, Officer Nichols determined that the occupants of the house were involved in operating a clandestine methamphetamine lab. Hence, on July 11, 2000, Officer Nichols requested the assistance of Sergeant Allen Bardwell, an officer with the Kalispell Police Department and team leader of the Kalispell SWAT team, in serving a search warrant. After meeting with Officer Nichols and learning that the house to be searched was a large structure consisting of three levels with numerous rooms and that it might be occupied by as many as fifteen individuals, Sergeant Bardwell contacted the Flathead County Sheriff Department's SWAT team for assistance. The commander of the Flathead County SWAT team, Undersheriff Chuck Curry, agreed to assist in the service of the warrant.

2

¶4 On July 24, 2000, Officer Nichols obtained a warrant to search the residence. In his application for the search warrant, Officer Nichols related that "out of the ordinary traffic" was seen coming and going from the residence and that a great number of the vehicles were from Washington state. Officer Nichols also stated that he checked the license plates on three of the vehicles that he had seen at the residence. One of them was registered to Klein. Officer Nichols then checked with Spokane County and discovered that Klein had been charged in the past with committing drug offenses. According to Officer Nichols, Klein also had three active felony warrants.

¶5 Officer Nichols also related in his search warrant application that several other individuals that had been seen near the residence had been charged with drug offenses. In addition, one of the vehicles seen at the residence was registered to an individual who had felony convictions for burglary and child rape. Officer Nichols also related that during his investigation, he discovered that there was a surveillance camera located in the second story east window of the residence and that it appeared to be pointed at the driveway.

¶6 Officer Nichols had discovered during the course of his investigation that an individual matching Klein's description had purchased ammunition from a local hardware store. While he did not include this information in the application for the search warrant, Officer Nichols did share this information with Sergeant Bardwell and Undersheriff Curry. However, the two-and-a-half month investigation, which included surveillance of the home, had yielded no observation or reports of weapons sighted in the home or in the possession

of any of the individuals in the home. Officer Nichols also discovered that Klein had a warrant for his arrest in connection with a nonviolent felony parole violation.

¶7 On the night of July 25, 2000, the two SWAT teams, totaling fifteen men, and officers from several other law enforcement agencies converged on Thompson Falls at approximately 1:45 a.m. Officer Nichols, Sergeant Bardwell, and Undersheriff Curry discussed the manner of executing the search warrant, including the question of whether the officers should knock and announce their presence and purpose before entering the house. They decided that the SWAT teams should enter the house at 4:00 a.m. without knocking and announcing.

¶8 On the morning of the raid, while the SWAT teams and other officers convened at the Thompson Falls Police Department for briefing, Officer Nichols ordered two officers to conduct surveillance on the residence from an upstairs bedroom of the house across the street. Officer Shawna Reinschmidt was watching the activities in the front of the house at 2:20 a.m. when a car, which had left the house about five minutes earlier, returned, and the male driver got out of the car and yelled at everyone to get inside and turn off the lights. Officer Reinschmidt reported her observations to the SWAT team assembled at the police department. Fearing that their presence may have been detected, the officers decided not to wait until 4:00 a.m. to execute the warrant. Officer Reinschmidt continued to observe the house and although she saw some movement in the kitchen, she later testified that her observations were entirely consistent with the occupants preparing to retire for the night.

¶9 Law enforcement officers executed their no-knock raid at 3:00 a.m. As the officers approached the house they observed that it was quiet and most of the lights were off. None

4

of the officers detected any activity or heard anything consistent with attempts to escape or resist arrest. There was no indication that any of the occupants had detected the officers' presence or anticipated the raid. There was also no indication that the house had been barricaded or booby trapped.

¶10     The officers approached the home from the west and the north, outside of the range of the surveillance camera located on the east side of the house. The Kalispell SWAT team was assigned to enter the house at the upper level from an outside stairway and the Flathead County SWAT team was assigned to enter the house from the ground floor. At least six officers from the Kalispell SWAT team entered the top floor by using a steel ram to break the doorjamb. They confronted four of the occupants of the house who were in various stages of sleep and preparation for sleep. Another seven or eight officers from the Flathead County SWAT team entered the house through the downstairs kitchen door confronting the two occupants residing in that portion of the house. Another five to ten officers surrounded the house. The officers did not knock and announce their presence prior to entering the house.

¶11     The six occupants of the house were all arrested, removed from the house, decontaminated and given clean jail clothing. Officers from the Criminal Investigation Division of the Montana Department of Justice then entered the house to collect evidence, disassemble the meth lab and decontaminate the area.

¶12     Appellants were each charged in separate proceedings with conspiracy to manufacture dangerous drugs; criminal production or manufacture of dangerous drugs; criminal

possession of dangerous drugs; and possession of dangerous drugs with intent to sell. Appellants each filed motions to suppress the evidence seized during the search of the residence, based in part on the officers' failure to knock and announce their presence prior to entering the house to execute the search warrant. The District Court denied the motions without an evidentiary hearing.

¶13 Cleveland and Anyan entered into plea agreements with the State, reserving the right to appeal from the District Court's adverse rulings on their motions to suppress. Cleveland pled guilty to criminal possession of dangerous drugs and was sentenced to a term of five years in Montana State Prison (MSP), with two years suspended. Anyan pled guilty to conspiracy to manufacture dangerous drugs and criminal possession of dangerous drugs. The District Court deferred imposition of Anyan's sentence for concurrent terms of five years and placed her on probation subject to certain conditions, including payment of $9,000 in restitution for her share of the damages caused to the rented house by the chemicals from the methamphetamine lab. Cleveland and Anyan appealed the District Court's failure to hold an evidentiary hearing in connection with their motions to suppress and to enter Findings of Fact and Conclusions of Law as required by § 46-13-104(3), MCA. On June 5, 2001, this Court consolidated the two appeals.

¶14 Klein entered into a plea agreement on June 19, 2001, wherein he reserved the right to appeal from the District Court's ruling on his motion to suppress. Klein pled guilty to criminal production or manufacture of dangerous drugs and possession of dangerous drugs with intent to sell. The District Court sentenced Klein to a term of ten years in MSP for the

6

charge of criminal production or manufacture of dangerous drugs and a concurrent term of twenty years, with ten years suspended for the charge of possession with intent to sell. Klein filed a notice of appeal on August 13, 2001.

¶15 On February 7, 2002, this Court issued an Order in the consolidated appeals of Anyan and Cleveland, dismissing the appeals without prejudice and remanding the cases to the District Court for an evidentiary hearing on the motions to suppress and the entry of Findings of Fact and Conclusions of Law. Klein's appeal was also dismissed without prejudice pursuant to a stipulation, and remanded to the District Court. Thereafter, Klein's case was consolidated with Anyan's and Cleveland's cases for purposes of the evidentiary hearing regarding the suppression motions.

¶16 On June 10, 2002, the District Court conducted the evidentiary hearing ordered by this Court. At the hearing, the court received testimony from Sergeant Bardwell, Undersheriff Curry, and Officer Reinschmidt. In addition, the District Court received the deposition testimony of Officer Nichols, who was unable to attend the evidentiary hearing because of his deployment with the National Guard.

¶17 The District Court issued its Findings of Fact, Conclusions of Law and Order denying Appellants' motions to suppress on July 31, 2002. In its order, the District Court determined that it was reasonable for law enforcement officers to believe that knocking and announcing their presence would be either dangerous, futile, or that it would inhibit the effective investigation of the crime by allowing the destruction of evidence. Hence, the District Court concluded that the no-knock entry was justified in this case and the court again denied

7

Appellants' motions to suppress. Appellants filed a consolidated notice of appeal on August 8, 2002.

**Standard of Review**

¶18     We review a district court's denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Olson*, 2003 MT 61, ¶ 11, 314 Mont. 402, ¶ 11, 66 P.3d 297, ¶ 11 (citing *State v. Dawson*, 1999 MT 171, ¶ 13, 295 Mont. 212, ¶ 13, 983 P.2d 916, ¶ 13). Further, the Ninth Circuit Court of Appeals has specifically held that the issue of whether exigent circumstances exist in the execution of a search warrant should be reviewed *de novo*. *United States v. Furrow* (9ᵗʰ Cir. 2000), 229 F.3d 805, 811, *overruled on other grounds by United States v. Johnson* (9ᵗʰ Cir. 2001), 256 F.3d 895.

**Discussion**

¶19    *Whether law enforcement officers' no-knock entry into Appellants' house to execute a search warrant violated Appellants' constitutional rights to privacy and to be free from unreasonable searches and seizures.*

¶20    This is an issue of first impression in Montana. Montana has no statutory provisions or case law addressing the knock and announce rule. Consequently, we look to the relevant federal law and the laws of our sister states to decide this issue. We also look to the greater protections afforded to Montanans in search and seizure matters under Article II, Sections 10 and 11 of the Montana Constitution. *See State v. Bullock* (1995), 272 Mont. 361, 383-84, 901 P.2d 61, 75; *State v. Siegal* (1997), 281 Mont. 250, 262-63, 934 P.2d 176, 183, *overruled in part and on other grounds by State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556; *State v. Elison*, 2000 MT 288, ¶¶ 46-47, 302 Mont. 228, ¶¶ 46-47, 14 P.3d 456, ¶¶46-47.

¶21    The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The knock and announce rule recognizes the powerful protections afforded by the Fourth Amendment to the sanctity of the home.

> Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved. The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment. Therefore, we have been adamant in our demand that absent exigent circumstances a warrant will be required before a person's home is invaded by the authorities.

*United States v. Becker* (9ᵗʰ Cir. 1994), 23 F.3d 1537, 1539-40 (internal citations omitted).

The knock and announce rule is intended to strike the proper balance between individual

rights and the police power of the state. *People v. Condon* (Ill. 1992), 592 N.E.2d 951, 957,

*cert. denied*, 507 U.S. 948, 113 S.Ct. 1359, 122 L.Ed.2d 738 (1993).

¶22    Underlying the knock and announce rule are concerns for the protection of privacy,

reduction in the potential for violence, and the prevention of the destruction of property of

private citizens. *State v. Bamber* (Fla. 1994), 630 So.2d 1048, 1052 (citing 2 Wayne R.

LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment*, § 4.8(a) (2d ed. 1987)

(hereinafter *LaFave*)).    "There is nothing more terrifying to the occupants than to be

suddenly confronted in the privacy of their home by a police officer decorated with guns and

the insignia of his office.  This is why the law protects its entrance so rigidly." *Richardson*

*v. State* (Fla. Dist. Ct. App. 2d Dist. 2001), 787 So.2d 906, 908.

> "The fear of a smashing in of doors by government agents is based upon much more than a concern that our privacy will be disturbed.  It is based upon concern for our safety and the safety of our families.  Indeed, the minions of dictators do not kick in doors for the mere purpose of satisfying some voyeuristic desire to peer around and then go about their business.  Something much more malevolent and dangerous is afoot when they take those actions.  It is that which strikes terror into the hearts of their victims.  The fourth amendment protects us from that fear as much as it protects our privacy."

*Becker*, 23 F.3d at 1540 (quoting *United States v. Lockett* (9ᵗʰ Cir. 1990), 919 F.2d 585, 592

(Fernandez, J., concurring)).

¶23    In *Bamber*, the Florida Supreme Court explained that as a matter of policy, no-knock

warrants are disfavored because of their staggering potential for violence to both the

occupants of the residence and the police.  *Bamber*, 630 So.2d at 1050.

> "[U]nannounced breaking and entering into a home could quite easily lead an
> individual to believe that his safety was in peril and cause him to take
> defensive measures which he otherwise would not have taken had he known
> that a warrant had been issued to search his home."

*Bamber*, 630 So.2d at 1052 (quoting *LaFave*, at 272).  Several years later, the Florida

Supreme Court also stated that

> [i]n failing to permit time for a response in executing a search warrant, the
> police follow a recipe for tragedy. . . .  Awakening citizens from slumber and
> depriving them of an opportunity to recognize law enforcement's presence and
> purpose could result in a misunderstanding with horrific consequences.

*Richardson*, 787 So.2d at 909.

¶24    The Illinois Supreme Court has also recognized that unexpected and unannounced

entries actually create, rather than prevent, deadly encounters between police and citizens.

*Condon*, 592 N.E.2d at 957.  Other states and circuits are in accord and have emphasized that

a legitimate purpose of knocking and announcing is to protect the safety of all involved.  *See*

*State v. Curtis* (Tenn. 1997), 964 S.W.2d 604, 609; *Becker*, 23 F.3d at 1540; *United States*

*v. Dice* (6th Cir. 2000), 200 F.3d 978, 982.

¶25    Because the Fourth Amendment protects property as well as privacy, another purpose

of the knock and announce rule is to prevent the needless destruction of property.  *Dice*, 200

F.3d at 982.  "[Q]uite obviously a person should ordinarily 'be allowed the opportunity to

11

voluntarily admit the officer into his home' instead of suffering damage to his property."
*Bamber*, 630 So.2d at 1052 (quoting *LaFave*, at 273).

¶26    In evaluating the scope of the Fourth Amendment right to be free from unreasonable searches and seizures, the United States Supreme Court in *Wilson v. Arkansas* (1995), 514 U.S. 927, 931, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976, looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing of the Fourth Amendment.  In doing so, the Supreme Court noted that

> [a]lthough the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment.  An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering.

*Wilson*, 514 U.S. at 931, 115 S.Ct. at 1916 (internal citations omitted).

¶27    After Sharlene Wilson made several narcotics sales to an informant, law enforcement officers with the Arkansas State Police obtained warrants to arrest her and search her home. The affidavit in support of the warrants stated that Wilson's housemate, Bryson Jacobs, had previously been convicted of arson and firebombing.  On the afternoon of the search, the officers found the main door to Wilson's home open.  As the officers opened an unlocked screen door and entered the residence, they identified themselves as police officers and stated that they had a warrant.  They found Wilson in the bathroom flushing marijuana down the toilet.  Wilson and Jacobs were arrested and charged with possession and distribution of marijuana and methamphetamine.  *Wilson*, 514 U.S. at 929-30, 115 S.Ct. at 1915-16.

12

¶28 Prior to trial, Wilson filed a motion to suppress the evidence seized during the search on various grounds including that the search was invalid because the officers failed to knock and announce their presence prior to entering the home. The trial court summarily denied the suppression motion. Wilson appealed to the Arkansas Supreme Court arguing that the Fourth Amendment requires officers to knock and announce prior to entering a residence. That court rejected Wilson's argument and affirmed her conviction on appeal. The United States Supreme Court granted certiorari to resolve the conflict among the lower courts as to whether the common law knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry. The Supreme Court held that it did. *Wilson*, 514 U.S. at 930, 115 S.Ct. at 1916.

¶29 In making this determination, the Supreme Court examined in *Wilson* the history of the common law knock and announce rule noting that although common law generally protected a man's house as "his castle of defense and asylum," common-law courts long held that the sheriff, acting on behalf of the King, could enter a man's house to arrest him "or to do other execution of the K[ing]'s process," but only after signifying the cause of his coming and requesting that the doors be opened. *Wilson*, 514 U.S. at 931, 115 S.Ct. at 1916 (citing 3 W. Blackstone, *Commentaries*; *Semayne's Case* (K.B. 1603), 5 Co. Rep. 91a, 91b, 77 Eng.Rep. 194, 195-96).

> [Before the sheriff may enter a man's house], he ought to signify the cause of his coming, and to make request to open doors . . . , for the law without a default in the owner abhors the destruction or breaking of any house (which is for the habitation and safety of man) by which great damage and inconvenience might ensue to the party, when no default is in him; for perhaps

he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it. . . .

*Wilson*, 514 U.S. at 931-32, 115 S.Ct. at 1916-17 (quoting *Semayne's Case*, 5 Co. Rep. at 91b, 77 Eng.Rep. at 195-96). The Supreme Court noted that the knock and announce principle appears to predate even *Semayne's Case*, which is usually cited as the judicial source of the common-law standard. "*Semayne's Case* itself indicates that the doctrine may be traced to a statute enacted in 1275, and that at that time the statute was 'but an affirmance of the common law.'" *Wilson*, 514 U.S. at 932 n.2, 115 S.Ct. at 1917 n.2 (quoting *Semayne's Case*, 5 Co.Rep. at 91b, 77 Eng.Rep. at 196).

¶30    The Supreme Court noted in *Wilson* that several prominent founding-era commentators agreed on the basic principle of knock and announce:

> According to Sir Matthew Hale, the "constant practice" at common law was that "the officer may break open the door, if he be sure the offender is there, if after acquainting them of the business, and demanding the prisoner, he refuses to open the door." See 1 M. Hale, Pleas of the Crown 582. William Hawkins propounded a similar principle: "the law doth never allow" an officer to break open the door of a dwelling "but in cases of necessity," that is, unless he "first signify to those in the house the cause of his coming, and request them to give him admittance." 2 W. Hawkins, Pleas of the Crown, ch. 14, § 1, p. 138 (6[th] ed. 1787). Sir William Blackstone stated simply that the sheriff may "justify breaking open doors, if the possession be not quietly delivered." 3 Blackstone 412.

*Wilson*, 514 U.S. at 932-33, 115 S.Ct. at 1917. In addition, most of the states that ratified the Fourth Amendment enacted constitutional provisions or statutes generally incorporating English common law and a few states enacted statutes specifically embracing the common-

law view that the breaking of the door of a dwelling was permitted once admittance was refused. *Wilson*, 514 U.S. at 933-34, 115 S.Ct. at 1917.

¶31    The *Wilson* Court further noted that while the common law principle of announcement is "embedded in Anglo-American law," the Court had never before squarely held that this principle is an element of the reasonableness inquiry under the Fourth Amendment. However, the Supreme Court determined in *Wilson* that

> [g]iven the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of search and seizure.

*Wilson*, 514 U.S. at 934, 115 S.Ct. at 1918.  Hence, the Court held that the common-law knock and announce principle does form a part of the Fourth Amendment reasonableness inquiry.  *Wilson*, 514 U.S. at 934, 115 S.Ct. at 1918.

¶32    The Court further held, however, that not every entry must be preceded by an announcement.  Rather,

> [t]he Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. . . . [T]he common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances.

*Wilson*, 514 U.S. at 934, 115 S.Ct. at 1918 (citing *Ker v. California* (1963), 374 U.S. 23, 38, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726).  While early common law did not require announcement in certain circumstances including felony arrests, that principle was gradually applied to cases involving felonies, yet the courts acknowledged that the presumption in

15

favor of announcement necessarily would give way to countervailing law enforcement interests. Those interests included circumstances presenting a threat of physical harm to officers, the fact that an officer is pursuing a recently escaped arrestee, and where officers have reason to believe that evidence would likely be destroyed if advance notice were given.

¶33 However, rather than giving a "comprehensive catalog" of the relevant countervailing factors, the *Wilson* Court left to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment. The Court simply held that although a search and seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry. *Wilson*, 514 U.S. at 936, 115 S.Ct. at 1919. Consequently, an officer serving a search warrant must comply with the knock and announce requirement unless there are exigent circumstances present which would present a threat of physical violence or the likelihood that evidence would be destroyed if the rule were not followed. *United States v. Dupras* (D. Mont. 1997), 980 F. Supp. 344, 347 (citing *Richards v. Wisconsin* (1997), 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615)..

*Exigent Circumstances*

¶34 Exigent circumstances have been defined as

> "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."

16

*United States v. Zermeno* (9th Cir. 1995), 66 F.3d 1058, 1063 (quoting *United States v. McConney* (9th Cir. 1984), 728 F.2d 1195, 1199, *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). The government bears the burden of proving that exigent circumstances existed. *United States v. Bates* (6th Cir. 1996), 84 F.3d 790, 794. An unjustified yet sincere belief in exigent circumstances does not justify non-compliance with the knock and announce rule. *United States v. Mendonsa* (9th Cir. 1993), 989 F.2d 366, 370 (citing *McConney*, 728 F.2d at 1206). Unless exigent circumstances exist, the failure of law enforcement officers to knock and announce their presence will render the evidence procured during the ensuing execution of the search warrant inadmissible. *Bates*, 84 F.3d at 795.

¶35 There are two types of exigencies, those that are foreknown and those unexpected that arise on the scene. *Dupras*, 980 F.Supp. at 347. The determination of whether an unannounced entry is reasonable must be made under the particular circumstances of each case. *Dupras*, 980 F.Supp. at 347. In the case before us on appeal, all of the factors that officers actually deemed exigent were actually known well in advance of applying for the search warrant. The SWAT teams became involved in this investigation almost two weeks prior to applying for a search warrant. It was at that point that the decision was made that there would be a no-knock forcible entry into the house. The court issuing the search warrant was never apprized of that decision, nor were any exigent circumstances laid out to the court when the search warrant was applied for.

17

¶36 Moreover,

> while peril to officers or the possibility of destruction of evidence or escape may well demonstrate an exigency, mere unspecific fears about those possibilities will not. Were they enough, the knock and announce statute would have been judicially amended to exclude virtually all narcotics-based cases. It has not been.

*Becker*, 23 F.3d at 1541. In fact, in *Richards*, the Supreme Court held that the Fourth Amendment does not permit a blanket exception to the knock-and-announce requirement in felony drug investigations. *Richards*, 520 U.S. at 394-95, 117 S.Ct. at 1421-22.

¶37 In *Richards*, law enforcement officers obtained a warrant to search Richards' motel room for drugs and related paraphernalia. One officer, dressed as a maintenance man, knocked on the door and stated that he was with maintenance. With the chain still on the door, Richards cracked it open, but slammed it closed again when he saw a uniformed officer standing behind the "maintenance man." After waiting two or three seconds, the officers kicked in the door. They claimed at trial that they identified themselves as police as they were kicking in the door. The officers caught Richards trying to escape through a window. They found cash and cocaine hidden in plastic bags in the bathroom ceiling. *Richards*, 520 U.S. at 388-89, 117 S.Ct. at 1418-19.

¶38 Richards sought to have the evidence from his motel room suppressed on the ground that the officers failed to knock and announce their presence prior to forcing entry into the room. The trial court denied the motion concluding that the officers could gather from Richards' behavior that he knew they were police officers and that he might try to escape or destroy evidence. The judge emphasized that the easily disposable nature of the drugs the

18

police were searching for further justified the officers' decision to identify themselves as they crossed the threshold instead of announcing their presence before seeking entry. The Wisconsin Supreme Court affirmed concluding that it was reasonable to assume that all felony drug crimes would involve "an extremely high risk of serious if not deadly injury to the police as well as the potential for the disposal of drugs by the occupants prior to entry by the police." *Richards*, 520 U.S. at 390, 117 S.Ct. at 1419 (quoting *State v. Richards* (Wis. 1996), 549 N.W.2d 218, 219). Thus, the Wisonsin Supreme Court concluded that exigent circumstances justifying a no-knock entry are always present in felony drug cases, hence, police officers are never required to knock and announce their presence when executing a search warrant in a felony drug investigation. *Richards*, 520 U.S. at 389-90, 117 S.Ct. at 1419-20.

¶39    The United States Supreme Court disagreed and determined that the Fourth Amendment does not permit a blanket exception to the knock-and-announce requirement for felony drug investigations. Rather, the Supreme Court held that to justify a no-knock entry, police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit effective investigation of the crime by, for example, allowing the destruction of evidence. *Richards*, 520 U.S. at 394-95, 117 S.Ct. at 1421-22.

¶40    The Supreme Court also held that creating exceptions to the knock-and-announce rule based on the "culture" surrounding a general category of criminal behavior presented two serious concerns: (1) the exception contains considerable overgeneralization as not every

drug investigation poses substantial risks to the officers' safety and the preservation of evidence; and (2) the reasons for creating an exception in one category can, relatively easily, be applied to others and thereby render meaningless the knock-and-announce element of the Fourth Amendment's reasonableness requirement. *Richards*, 520 U.S. at 392-94, 117 S.Ct. at 1420-21.

¶41 Although the Supreme Court rejected the Wisconsin court's blanket exception to the knock and announce requirement in *Richards*, the Supreme Court agreed with the trial court that on the facts of that case, it was reasonable for the officers to believe that Richards knew, after he opened the door, that the men seeking entry to his room were the police and that once the officers reasonably believed that Richards knew who they were, it was reasonable for them to force entry immediately given the disposable nature of the drugs. *Richards*, 520 U.S. at 395, 117 S.Ct. at 1422.

¶42 We next discuss those factors that may present exigent circumstances obviating the necessity to knock and announce.

*A. Safety concerns*

¶43 Exigent circumstances cannot be predicated upon general fears of the officers executing a search warrant in a narcotics investigation. *Zermeno*, 66 F.3d at 1063. While peril to officers may well demonstrate an exigency, mere unspecific fears about that possibility will not. *Becker*, 23 F.3d at 1541; *United States v. Moore* (10th Cir. 1996), 91 F.3d 96, 98. In *Moore*, the Tenth Circuit Court of Appeals stated:

> The mere statement that firearms are present, standing alone, is insufficient. The government must go further and demonstrate that the presence of firearms raised a concern for the officers' safety. . . . [O]fficers are concerned about an armed response when they execute *any* narcotics search warrant. Clearly, though, to expand the exigent circumstances exception to that extent would completely swallow the rule.

*Moore*, 91 F.3d at 98 (internal citations omitted).

¶44 Hence, a mere suspicion that weapons would be at a residence does not provide an exigency for the officers' failure to properly knock and announce their presence. "Our cases have made it clear that generalized fears about how drug dealers usually act or the weapons that they usually keep is not enough to establish exigency." *United States v. Granville* (9th Cir. 2000), 222 F.3d 1214, 1219. Evidence that firearms are within the residence or that a particular defendant is armed is not by itself sufficient to create an exigency. *Becker*, 23 F.3d at 1541; *United States v. Marts* (8th Cir. 1993), 986 F.2d 1216, 1218. There must be specific information to lead the officers to a reasonable conclusion that the presence of firearms raises concerns for the officers' safety. *Moore*, 91 F.3d at 98. Furthermore,

> [t]he presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent. Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant. However, threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence.

*Bates*, 84 F.3d at 795 (internal citations omitted). "A concern for police safety must be based upon prior knowledge or direct observation that the subject of the search keeps weapons *and*

21

that such person has a known propensity to use them." *State v. Valentine* (Ohio Ct. App. 1991), 598 N.E.2d 82, 85 (emphasis in original) (quoting *State v. Jeter* (Wash. 1981), 634 P.2d 312, 314).

¶45 In the case *sub judice*, the officers had no information that any of the occupants of the house possessed weapons. Officer Nichols had information that a person matching Klein's description had purchased ammunition. However, even after months of surveillance, Officer Nichols had no information of weapons being in the residence and no report of anyone seeing any of the occupants of the house, including Klein, with weapons. There was no testimony indicating that any of the occupants of the house were prone to violence or the use of weapons or had ever made threats against law enforcement officers.

¶46 Prior to initiating the raid, Sergeant Bardwell completed a risk analysis report intended to assess the risk associated with specific individuals who the officers anticipate might be present during a raid. Sergeant Bardwell testified that Klein was the only person considered in conjunction with the risk analysis assessment and the only person about whom Sergeant Bardwell had any information prior to the raid. Sergeant Bardwell agreed that the only criterion that applied to Klein from the risk analysis checklist was that he was on probation or parole for a nonviolent offense. Sergeant Bardwell testified that he had no concrete evidence to substantiate the assumption that there might be weapons in the house. Sergeant Bardwell also agreed that there was no record or information of Klein ever being violent; having any violent criminal record; resisting arrest or assaulting a police officer; possessing weapons; being mentally unstable; using drugs or alcohol; having a military or

22

police background; or being associated with any organization suspected of violent criminal activity. Sergeant Bardwell further stated that he had no information regarding the identities, characteristics or background of any other individuals in the house.

¶47 While Officer Nichols' later investigation revealed that several occupants of and visitors to the house had criminal backgrounds involving violent offenses, that information cannot now be used to justify the officers' no-knock entry into Appellants' house. "[I]n determining the lawfulness of entry and the existence of probable cause, we may concern ourselves only with what the officers had reason to believe *at the time of their entry*." *United States v. Ramirez* (1998), 523 U.S. 65, 71 n.2, 118 S.Ct. 992, 997 n.2, 140 L.Ed.2d 191 (quoting *Ker*, 374 U.S. at 40-41 n.12, 83 S.Ct. at 1634 n.12) (emphasis in original). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *United States v. Banks* (2003), 540 U.S. 31, 39, 124 S.Ct. 521, 527, 157 L.Ed.2d 343 (quoting *Graham v. Connor* (1989), 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443).

¶48 The State claims that another factor in determining exigency under the safety exception is the inherent danger in methamphetamine labs. In this case, although Officer Nichols expressed concerns regarding the safety of neighborhood residents, he made no attempt to evacuate any residences. In fact, Officer Reinschmidt, who was conducting surveillance from a house directly across the street from Appellants' residence, did not request the residents of the house she was using for surveillance to leave while the surveillance and the raid were being conducted.

23

¶49    Additionally, Officer Reinschmidt testified that after she saw some activity in Appellants' driveway and heard someone yell to go inside and cut the lights, she saw no other suspicious activity in the house. Officer Reinschmidt further testified that although she saw some movement in the kitchen, the house was quiet and her observations were entirely consistent with the residents preparing to retire for the night.

¶50    Furthermore, as the officers approached the house to execute the search warrant, they did not detect any activity or hear anything consistent with attempts to escape, resist arrest, barricade the doors, destroy evidence or dismantle the meth lab.  There was no indication that any of the occupants of the house had detected the officers' presence or anticipated an invasion.

### B.  Futility

¶51    The futility exception to the knock and announce rule excuses the knock and announce requirement where police officers have a reasonable suspicion that the occupants know of the presence and purpose of the police prior to their entry into the residence.  *See Bates*, 84 F.3d at 795 (exigent circumstances exist when the occupants already know of the officers' authority and purpose); *United States v. Dunnock* (4th Cir. 2002), 295 F.3d 431, 435, *cert. denied*, 537 U.S. 1037, 123 S.Ct. 570, 154 L.Ed.2d 457 (2002) (futility exception applied where person arrested outside of his home had notice of the authority and purpose of the officers executing the search warrant).

¶52    In *United States v. Peterson* (9th Cir. 2003), 353 F.3d 1045, the Ninth Circuit Court of Appeals addressed this exception to the knock and announce rule.  Just before SWAT

team members were ready to knock on Peterson's door to serve a search warrant, one of the occupants of the residence opened the door. Recognizing the group of people he saw on the porch to be police officers, he attempted to close the door as one of the officers shouted "Police, with a search warrant." The officers then forced the door open. On appeal, Peterson argued that the officers' entry of his residence was unreasonable under the Fourth Amendment. *Peterson*, 353 F.3d at 1047-48.

¶53 The Ninth Circuit concluded that the officers' no-knock entry was justified on the grounds of futility, destruction of evidence and danger. In addressing the issue of futility, the Ninth Circuit stated that

> the SWAT team originally intended to announce its presence. However, just as this announcement was about to be made, Edwards unexpectedly opened the door, saw that police were outside, and attempted to deny them entry. Were we to hold that the police were required to announce their presence in this case and wait some further period of time while the occupants reconsidered whether to admit or resist them, it would amount to mandating a meaningless act. Announcement would have been futile. *Just as one cannot close a door that is already closed, one cannot "announce" a presence that is already known.*

*Peterson*, 353 F.3d at 1049 (emphasis added).

¶54 The Tenth Circuit Court of Appeals determined in *Moore*, that while executing a warrant, police officers could not claim that they were constructively refused admittance to a residence so as to permit forcible entry where forced entry was "virtually instantaneous" with the officers' announcement of their presence and authority. *Moore*, 91 F.3d at 98.

¶55 In the present case, the State conceded in oral argument that the futility exception was not applicable in this case. Sergeant Bardwell testified that the presence of the surveillance

25

camera was not a consideration in planning the no-knock raid, since the speed of entry would undermine the effectiveness of any surveillance. Sergeant Bardwell also observed that entry into the house could be planned in such a manner as to avoid the surveillance camera. In fact, the SWAT teams approached the house from the north and west, thereby effectively remaining outside of the range of the surveillance camera. Additionally, the raid was conducted at night and the officers had no information that the camera was operational, especially in the dark.

¶56   Moreover, Sergeant Bardwell testified that the existence of counter-surveillance was important only to the extent, "[t]hat if they have an operation that they deem the expense and trouble to put up counter-surveillance, it's probably a pretty substantial operation that they have."

¶57   The Illinois Supreme Court held in *Condon* that even if the occupants of the house had been aware of the police approaching via a surveillance camera, the State had offered no specific testimony that the occupants would have done anything violent or tried to escape. Thus, the Illinois Court held that the surveillance equipment did not constitute an exigent circumstance that relieved the police of their responsibility to knock and announce. *Condon*, 592 N.E.2d at 956.

### C. Destruction of evidence

¶58   We also conclude that in this case the possibility of destruction of evidence did not create an exigent circumstance justifying the no-knock entry into Appellants' house.

26

The possibility that an individual may destroy drug evidence can also create exigent circumstances. However, the government must prove they had "a reasonable belief that the loss or destruction of evidence [was] imminent." The mere possibility or suspicion that a party is likely to dispose of evidence when faced with the execution of a search warrant is not sufficient to create an exigency.

*Bates*, 84 F.3d at 796 (internal citations omitted).

¶59 The larger the amount of drugs and the more complex the operation, the less likelihood there is that evidence will be destroyed during the period between the knock and announce and the subsequent entry. *See United States v. Tavares* (8th Cir. 2000), 223 F.3d 911, 917.

¶60 In this case, both Sergeant Bardwell and Undersheriff Curry testified that the mere fact that the residence contained a meth lab would not justify a no-knock entry. Moreover, Sergeant Bardwell testified that the potential for the destruction of the meth lab was not a concern in deciding to take on the assignment. Both Sergeant Bardwell and Undersheriff Curry agreed that a meth lab cannot be destroyed in a matter of five to ten seconds.

**Conclusion**

¶61 Under the Fourth Amendment and the federal authority cited above, the knock and announce rule applies in Montana the same as in our sister states. Even were it not for that authority, though, Article II, Sections 10 and 11 of the Montana Constitution provide greater protections against unreasonable searches and seizures and government infringement of individual privacy than does the federal constitution. *See Bullock*, 272 Mont. at 383-84, 901 P.2d at 75; *Siegal*, 281 Mont. at 262-63, 934 P.2d at 183; *Elison*, ¶¶ 46-47.

¶62 Accordingly, in our application of these constitutional provisions and authorities, we hold that, on the facts here, the forced entry into the Appellants' house and subsequent search was unreasonable under the Fourth Amendment and under Article II, Sections 10 and 11 of the Montana Constitution because the law enforcement authorities failed to knock and announce their presence before executing the search warrant. Here, the exigencies claimed by the State as justification for the no-knock entry were all foreknown by the authorities. Hence, we hold that the State failed to meet its burden to prove that exigent circumstances obviated the necessity to comply with the knock and announce rule.

¶63 Moreover, we agree with the Appellants that the decision to make a no-knock entry should ordinarily be made by a neutral and detatched magistrate as part of the applicaton for search warrant. An investigating officer may, however, make this decision based on unexpected exigent circumstances that arise on the scene. When law enforcement officers contemplate a no-knock entry in executing a search warrant, that intention must be included in the application for the search warrant along with any foreknown exigent circumstances

28

justifying the no-knock entry. This approach is consistent with our prior jurisprudence--i.e., when the right to privacy must reasonably yield to an application to search, that decision should be made by a judicial officer, and not by the police. *State ex rel. Townsend v. District Court* (1975), 168 Mont. 357, 360, 543 P.2d 193, 195. And, the review of a search warrant application by an impartial magistrate ensures that a neutral and detached evaluation of the situation is interposed between the investigating officer and the private citizen. *State v. Wilson* (1994), 266 Mont. 146, 149, 879 P.2d 683, 684.

¶64    The knock and announce rule is a flexible one. Courts must determine whether an unannounced entry is reasonable under the particular circumstances of each case. *Richards*, 520 U.S. at 394, 117 S.Ct. at 1421. The time an officer must wait before using force to enter the house after knocking and announcing depends on the circumstances of each case. *McClure v. United States* (9th Cir. 1964), 332 F.2d 19, 22, *cert. denied*, 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965).

¶65    In conclusion, we hold that the law enforcement officers' no-knock entry into Appellants' house to execute the search warrant violated Appellants' federal and state constitutional rights to be free from unreasonable searches and seizures. Consequently, the trial court erred in failing to suppress the evidence resulting from that search.

¶66    This cause is reversed and remanded for further proceedings consistent with this Opinion.

¶67    That said, the dissent has raised several contentions that deserve a response. First, the dissent faults the Court for failing to rely more heavily on the United States Supreme Court's

29

decisions in *Banks* and *Ramirez*. However, the dissents' concern in that regard is misplaced because the facts in both *Banks* and *Ramirez* are dissimilar from the facts in the instant case.

¶68    In the case *sub judice*, the officers failed to knock and announce their presence. In *Banks*, not only did the officers knock and announce their presence, they waited 15 to 20 seconds before forcibly entering the residence. There the Supreme Court did not analyze whether it was proper for the officers to knock and announce, but whether the 15-to-20-second wait was reasonable. The Supreme Court even stated in *Banks* that "[t]here has never been a dispute that these officers were *obliged* to knock and announce their intentions when executing the search warrant. . . ." *Banks*, 540 U.S. at 35, 124 S.Ct. at 524 (emphasis added).

¶69    Moreover, the reason the Supreme Court determined that the 15-to-20-second wait was reasonable in *Banks* was because of the easily disposable nature of the cocaine. *Banks*, 540 U.S. at 38, 124 S.Ct. at 526. Hence, the exigency the Supreme Court relied on in *Banks* to uphold the search was the opportunity to get rid of the cocaine. In the instant case, the not so easily disposable nature of the methamphetamine lab removed that particular exigency.

¶70    Likewise, *Ramirez* is also dissimilar from the instant case. In *Ramirez*, officers obtained a "no-knock" warrant granting them permission to enter and search Ramirez's home for an escaped prisoner who was reported to have made threats to kill witnesses and police officers. It was also believed that the escapee had access to a large supply of weapons. *Ramirez*, 523 U.S. at 68, 118 S.Ct. at 995. Unlike the instant case, the question before the Supreme Court in *Ramirez* was whether the Fourth Amendment holds officers to a higher

30

standard when a "no-knock" entry results in the destruction of property. The Supreme Court held that it did not. *Ramirez*, 523 U.S. at 68, 118 S.Ct. at 995.

¶71    Second, the dissent faults the Court for not placing more significance on the presence of the surveillance cameras. While the dissent quotes Officer Bardwell's testimony regarding his concerns about the cameras, the dissent fails to note the most significant observation of Officer Bardwell, that the officers could approach the house outside of the view of the cameras and thus remain undetected, thereby rendering the cameras useless.

¶72    Finally, the dissent objects to our analysis complaining that we have taken the "totality" out of "totality of the circumstances." Contrary to the dissents' contention, in order to examine the "totality" of the circumstances, each circumstance must first be considered on its own strength. In *People v. Condon* (Ill. 1992), 592 N.E.2d 951, *cert denied*, 507 U.S. 948, 113 S.Ct. 1359, 122 L.Ed.2d 738 (1993), the Illinois Supreme Court was faced with a case factually similar to the case before us on appeal including that the residence to be searched had two closed circuit television cameras along with a police scanner to monitor traffic near the residence. The court in *Condon* expressed its disagreement with the State's argument that if the circumstances were viewed synergistically, they must constitute exigent circumstances.

> While there is a certain appeal to the State's argument, we cannot agree that just because there are a number of circumstances, not one of which standing alone would create an exigency, the sheer volume of circumstances without something more is sufficient to create exigent circumstances.

31

*Condon*, 592 N.E.2d at 955.  Instead, the court stated that "[w]e must necessarily deal with each potential exigent circumstance individually, since the individual circumstances equal the totality."  *Condon*, 592 N.E.2d at 955.  We agree with the reasoning of the Illinois Supreme Court because, simply put, zero plus zero can never equal one. *State v. Giant*, 2001 MT 245, ¶ 39, 307 Mont. 74, ¶ 39, 37 P.3d 49, ¶ 39.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

Justice Jim Rice dissenting.

¶73    I respectfully dissent. I appreciate the Court's effort in analyzing this issue of first impression, but, in my view, the Court has overlooked or failed to emphasize superior precedent which would require a different outcome when applied to the facts here. Although discussing the United States Supreme Court's decisions in *Wilson* and *Richards* at some length, the Court makes only a single, passing reference to each of the Supreme Court's two most recent decisions regarding this issue, *United States v. Ramirez* and *United States v. Banks*.[1] The Court appears to have eschewed these holdings in favor of holdings from other state courts and United States Circuit Court decisions, particularly the Ninth Circuit. Though I take no issue with citing to the Ninth Circuit generally, it bears mention, and consideration, that the Ninth Circuit Court's analytical approach to this issue has been criticized and its holdings have been overruled by the high court. The Supreme Court has provided instruction that I would apply to this case.

¶74    I begin with the standard of review. The Court cites to the Ninth Circuit Court's holding in *United States v. Furrow* for the proposition that *de novo* review is exercised on search warrant exigency issues. *See* ¶ 18. *Furrow* did not establish that standard, but simply restated the standard which, after analysis, had been adopted by the Ninth Circuit in *United States v. McConney* (9th Cir. 1984), 728 F.2d 1195. *Furrow*, 229 F.3d at 811. A review of

---

[1]*Banks* dealt with a forceful entry by police some fifteen to twenty seconds following their "knock and announce." The Court stated that the "same criteria bear on when the officers could legitimately enter after knocking" as those for "dispensing with a knock and announcement" altogether. *Banks*, 540 U.S. at 35.

33

*McConney*'s holding reveals that the Ninth Circuit's *de novo* standard is significantly different than the *de novo* review we have previously exercised. Beginning with our Court, we have held:

> We review a district court's denial of a motion to suppress "to determine whether the court's findings of fact are clearly erroneous and whether its interpretation and application of the law are correct." *State v. Meyer*, 2004 MT 272, 323 Mont. 173, 99 P.3d 185.

*State v. DeWitt*, 2004 MT 317, ¶ 21, 324 Mont. 39, ¶ 21, 101 P.3d 277, ¶ 21. Further, regarding exigent circumstances, we have held:

> Whether the factual circumstances determined by a district court constitute exigent circumstances is a conclusion of law reviewed for correctness. *State v. Saxton*, 2003 MT 105, ¶ 19, 315 Mont. 315, ¶ 19, 68 P.3d 721, ¶ 19.

*State v. Lanegan*, 2004 MT 134, ¶ 11, 321 Mont. 349, ¶ 11, 91 P.3d 578, ¶ 11.

¶75 The Ninth Circuit's "*de novo* review," as adopted in *McConney* and reiterated in *Furrow*, is something quite different than our Court's review "anew" of the trial court's conclusions of law for correctness. The Ninth Circuit's review is premised on its determination that exigent circumstances questions are mixed questions of law and fact. Its analysis, in part, is as follows:

> In summary, to classify mixed questions of law and fact for standard of review purposes, we adopt a functional analysis that focuses on the nature of the inquiry required when we apply the relevant rule of law to the facts as established. The analysis is not a precise one and does not offer any litmus test by which all mixed questions can be neatly categorized. It does not "unerringly distinguish between findings of fact and conclusions of law." *Pullman-Standard v. Swint*, 456 U.S. at 289 n.19, 102 S.Ct. at 1790 n.19. Nonetheless, we think that if we focus on the nature of the inquiry required in determining whether the established facts fall within the relevant legal definition, we

34

employ a neutral test that accurately reflects the concerns that properly underlie standard of review jurisprudence.

## III

Applying our functional analysis to the case at hand, we conclude that the mixed question of exigent circumstances is reviewable de novo as a question of law, and, consequently, we overrule *Flickinger*. Our reason is this: to decide if the facts satisfy the legal test of exigency–whether, judged by an objective standard, "there [was] a likelihood that the occupants [would] attempt to escape, resist, destroy evidence, or harm someone within," *United States v. Bustamante-Gamez*, 488 F.2d 4, 12 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 40 L.Ed.2d 559 (1974),–necessarily involves us in an inquiry that goes beyond the historical facts.

The mixed question of exigency is rooted in constitutional principles and policies. Like many such mixed questions, its resolution requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests. In particular, its resolution requires that we strike a balance between two sometimes conflicting societal values– the safety of law enforcement officers and fourth amendment privacy interests. The essential and difficult question raised by this balancing is how much risk police officers can reasonably be expected to assume before disregarding the rules society has adopted to otherwise circumscribe the exercise of their considerable discretionary authority in carrying out their vital law enforcement duties.

This is a question that no amount of fact-finding will answer. The inquiry requires us to ask not merely whether the trial judge was correct in finding that Olson in fact had reason to believe, for instance, that McConney was a member of the Hell's Angels Motorcycle Club or that he had a prior felony conviction; it also requires a determination whether these facts and any other information Olson had about McConney's past are sufficient to satisfy the legal standard for exigency. We must decide, for instance, whether a reasonable belief that a suspect is a member of the Hell's Angels Club, without demonstration of a link to criminal activity, is relevant to the issue of exigency, *cf. United States v. Rubio*, 727 F.2d 786 at 793 (9th Cir. 1983) (membership in Hell's Angels without a link to actual criminal activity insufficient to support a finding of probable cause to issue a search warrant). We must also decide how much weight may be given to an officer's

knowledge that a suspect has previously been convicted of an unspecified felony.

When, as here, the application of law to fact requires us to make value judgments about the law and its policy underpinnings, and when, as here, the application of law to fact is of clear precedential importance, the policy reasons for de novo review are satisfied and we should not hesitate to review the district judge's determination independently.

In conclusion, we hold that the mixed question of exigent circumstances is not reviewable under the clearly erroneous test because it is not, like the question of intent, essentially factual. We do not at this juncture decide how any other mixed question should be reviewed. We do, it is true, adopt a functional analysis for the resolution of these questions. But our approach is an ad hoc one, permitting individual analysis and classification of each type of mixed question. Under it, we need only decide that the question of exigent circumstances is subject to de novo review.

*McConney*, 728 F.2d at 1204-05.

¶76 Rather than import the Ninth Circuit's "mixed question" analysis, and all that comes with it, I would retain our previously applied *de novo* review of warrant exigency questions– that is, approaching the issue as a legal conclusion reviewed for correctness and exercising deferential review on related factual questions, as we stated in *Lanegan* and *DeWitt*.

¶77 Turning to the merits, the Court correctly notes that the "no-knock" rule adopted by the United States Supreme Court in *Richards* is a "flexible one," and that courts must determine whether an unannounced entry is reasonable under the particular circumstances of each case. However, the Court then concludes that, under the facts here, officers violated the defendants' federal and state constitutional rights by failing to knock and announce. *See* ¶¶ 64-65. In this regard, I will begin by discussing amplifications of the *Richards* rule which have been announced, believing these to be necessary for proper resolution of the issue.

36

¶78   First, *Richards* held that, although police should be required to make the necessary showing whenever the reasonableness of a no-knock entry is challenged, the showing itself is "not high." *Richards*, 520 U.S. at 394-95; *see also United States v. Diehl* (1st Cir. 2002), 276 F.3d 32, 44, *cert. denied, Diehl v. United States* (2002), 537 U.S. 834, 123 S.Ct. 193, 154 L.Ed.2d 52 ("This burden is not large and the version of the record favoring the trial court's ruling governs."). Further, it is not necessary to establish a level of proof satisfying the probable cause standard. *Richards*, 520 U.S. at 394; *see also United States v. Grogins* (4th Cir. 1998), 163 F.3d 795, 797 (reversing the district court's suppression of evidence because "the district court's scrutiny approximated, if it did not exceed, the probable cause standard. The Supreme Court has expressly rejected this standard with respect to forgoing knocking and announcing" and citing *Richards*.)

¶79   Indeed, the *Richards* "reasonable suspicion" standard is the same standard applied for the reasonableness of an investigative stop. *Richards*, 520 U.S. at 394 (citing *the Terry v. Ohio* (1968), 392 U.S.1, 88 S.Ct. 1868, 20 L.Ed.2d 889, stop and frisk standard); *see also United States v. Banks* (2003), 540 U.S. 31, 42, 124 S.Ct. 521, 528, 157 L.Ed.2d 343, 355-56 (in knock and announce case, applying investigative stop principles from *United States v. Arvizu* (2002), 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740). Thus, the showing necessary for officers to initiate an investigative stop, a standard well established by our myriad of cases addressing that issue, is the standard we are to apply here. That standard provides helpful illustration about the kind and amount of information required to justify the officers' no-knock entry.

¶80 "Whether particularized suspicion supports an investigative stop is a question of fact that is analyzed in the context of the totality of the circumstances." *State v. Martinez*, 2003 MT 65, ¶ 23, 314 Mont. 434, ¶ 23, 67 P.3d 207, ¶ 23 (citing *State v. Pratt* (1997), 286 Mont. 156, 161, 951 P.2d 37, 40). "[I]n order for the State to prove the existence of particularized suspicion, the State must show: (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing or was a witness to criminal activity." *State v. Gopher* (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. The *Richards* rule is consistent herewith, thereby satisfying both federal and state constitutional requirements: "In order to satisfy a 'no-knock' entry, police must have a *reasonable suspicion* that knocking and announcing their presence, *under the particular circumstances*, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards*, 520 U.S. at 394 (emphasis added); *see also Ramirez*, 523 U.S. at 70. With these standards in mind, I turn to the circumstances of this case.

¶81 *1. Nature of the crime investigated.* Citing to *Richards*' holding that there can be no "blanket exceptions" to the knock-and-announce rule for felony drug investigations, the Court simply dismisses the nature of the crime here as irrelevant to the inquiry. *See* ¶ 39. This is an incorrect application of *Richards*, which also concluded that "[i]t is indisputable that felony drug investigations may frequently involve both" the threat of physical violence and the likelihood of destruction of evidence, and cited its previous discussions about these connections. *Richards*, 520 U.S. at 391. *Richards* merely concluded that this connection

38

could not justify a *blanket* exception to the knock-and-announce rule that would alleviate case-by-case evaluation. *Richards*, 520 U.S. at 391-92. However, contrary to this Court's analysis, the nature of the crime being investigated is nonetheless a key factor which must be considered by police. "'[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms' and that 'entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers.'" *United States v. Kennedy* (4th Cir. 1994), 32 F.3d 876, 882 (citing *United States v. Bonner* (D.C. Cir. 1989), 874 F.2d 822, 824). In *Banks*, the Supreme Court recognized that the police's approach to a house to execute a search warrant for cocaine may differ from their approach with a warrant for a stolen piano. "Police seeking a stolen piano may be able to spend more time to make sure they really need the battering ram." *Banks*, 540 U.S. at 41.

¶82 Here, police were not seeking a stolen piano. They were executing a felony drug warrant. The Court fails to consider this distinction, but more, also dismisses the significance of the kind of drugs involved here–a methamphetamine laboratory. The Court should well know by now that "meth labs" are inherently unstable and dangerous, presenting this additional danger to officers. Nonetheless, the Court concludes this factor is not relevant to the inquiry because police "made no attempt to evacuate any residences." *See* ¶ 48. Unfortunately, the dismissal of this concern by the Court does not accurately reflect the evidence in the record. To the contrary, Officer Bardwell testified that the situation here–"a meth lab with multiple suspects and they had warrants"–weighed significantly in his mind. The District Court specifically found that "a methamphetamine laboratory was in the

39

residence to be searched, which presented a high hazard level." The Court improperly concludes this evidence has no bearing–on the basis of its own evaluation.

¶83 *2. Purchase of ammunition by Klein.* Citing authority for the proposition that "[e]vidence that firearms are within the residence or that a particular defendant is armed is not *by itself* sufficient to create an exigency," *see* ¶ 44 (emphasis added), the Court dismisses the evidence of Klein's ammunition purchase as insufficient to constitute exigency. I do not disagree with the cited authority, only the Court's application of it. Klein's ammunition purchase may *by itself* have been insufficient to establish an exigency, but that did not render this evidence irrelevant to the inquiry. The Court reasons as if the evidence did not exist or was completely inconsequential. To the contrary, Officer Bardwell testified that evidence of the ammunition purchase by Klein, a fugitive felon, was significant to his analysis, and the District Court found this fact to be significant.

¶84 The Court rejects the District Court's finding, and instead engages in a "no existence" analysis; that is, it repeatedly focuses on the evidence which the police did *not* have, a tactic the Court uses throughout the opinion. *See also* ¶ 50. Here, because the police had "no information" about whether the occupants were armed and "no information" about weapons being in the house, the Court concludes that the ammunition purchase by Klein is simply immaterial. *See* ¶ 45. This is a faulty inquiry. The proper focus in determining reasonable suspicion is what police *did* observe, and whether "an experienced police officer can make certain inferences" therefrom. *Gopher*, 193 Mont. at 194, 631 P.2d at 296. Thus, I disagree with the Court's conclusion about this evidence. Purchase of ammunition by a fugitive felon

who is associating with a group operating a meth lab is not a "mere unspecific fear," *see* ¶ 43, and this is another fact that should be properly considered.

¶85   *3.   The video surveillance camera.*  Under the opinion's section entitled "Futility,"[2] the Court discards the evidence regarding the surveillance camera because "Sergeant Bardwell testified that the presence of the surveillance camera was not a consideration in planning the no-knock raid, since the speed of entry would undermine the effectiveness of any surveillance." *See* ¶ 55. Here, the Court illogically reasons that because the surveillance camera would be rendered ineffective by the speed of the no-knock entry, the camera was therefore not a factor to be considered in justifying the no-knock entry.  Obviously, the camera would not have been rendered ineffective but for the no-knock entry.  In addition to this error in logic, the Court again critically misapprehends Officer Bardwell's testimony. Officer Bardwell offered testimony to the precisely opposite conclusion about the significance of the surveillance camera:

> Defense:   When you were planning the raid did you take the surveillance camera into consideration?
>
> Bardwell:   When we did the raid; absolutely.
>
> Defense:   When you were planning the raid did you plan around that surveillance camera?
>
> Bardwell:   Not about any particular camera.  We planned our raid, or considerations on the raid, that they had counter-surveillance, whether they had one camera or two cameras.

---

[2]The United States Supreme Court analyzes "futility" as a separate basis for a no-knock entry, not as a subcategory of exigency.  *See Banks*, 540 U.S. at 37 n.3.

41

Defense: Okay. So it really didn't matter, then, in planning the raid that the surveillance cameras were there.

Bardwell: Oh, it mattered a lot; yeah.

Defense: How did it matter in terms of planning your raid?

Bardwell: That if they have an operation that they deem the expense and trouble to put up counter-surveillance, its probably a pretty substantial operation that they have.

. . . .

Defense: Did that fact have any bearing on your decision to make a no-knock entry in this case?

Bardwell: Actually it was a great deal.

Defense: It did.

Bardwell: Yes.

From this testimony, the District Court found that the presence of the camera was significant and indicated a substantial drug operation was inside the house. The Court simply disregards this evidence as worthless.

¶86    *4. The number of suspects in the house and their criminal backgrounds.* The Court focuses too narrowly on this issue, merely noting that Klein was "the only person about whom Sergeant Bardwell had any information prior to the raid" and discussing only Klein. *See* ¶ 46.  More accurately, Klein was the only person that Bardwell had noted on a risk assessment form prepared shortly before the raid, but, in any event, that was not the extent of the investigation.  Other suspects were also investigated by officers. Officer Nichols' pre-entry investigation had revealed that the house was occupied by as many as fifteen

42

individuals, including suspects with previous charges for carrying a concealed weapon, domestic assault, felony assault, and child rape. Another individual had been charged with four instances of domestic assault and a weapon violation, while still another had previously been charged with intimidation with a weapon, unlawful domestic imprisonment, and interference with domestic violence reporting. Information about the group was shared with Bardwell, and although he was not advised of all the prior charges, he was aware of the criminal involvement. This is significant evidence in support of a no-knock entry which the Court completely overlooks. Obviously, the suspects had a history of violence. Further, the number of suspects in the house, finally thought to be between six and eight at the time of the raid, raised concerns about officer safety and possible escape that led officers to pursue a no-knock entry.

¶87 **5. Other factors.** The evidence indicated various other factors considered by officers in deciding that a no-knock entry was necessary. One was that the house was a three-story structure with numerous rooms. Police expressed concern about timely securing such a large structure, particularly in light of the number of suspects. Another was the pre-raid incident when one of the suspects yelled for everyone to get inside and turn off the lights, which prompted officers to move up the timing of the entry.

¶88 Additional factors could be analyzed, but this is enough. Clearly, there were specifically identifiable, objective factors which indicated to police that the situation required a no-knock entry. However, the Court, engaging in a "divide and conquer" analysis, systematically eliminates the effect of each factor. This is precisely the kind of analysis

43

which the United States Supreme Court criticized when reversing the Ninth Circuit Court in *Banks*. The Court first recalled its holding in *Arvizu,* where it stated:

> We think that the approach taken by the [Ninth Circuit] Court of Appeals here departs sharply from [our] cases. The court's evaluation and rejection of seven of the listed [evidentiary] factors in isolation from each other does not take into account the "totality of the circumstances," as our cases have understood that phrase. The court appeared to believe that each observation by [the officer] that was by itself readily susceptible to an innocent explanation was entitled to 'no weight.' [Citation omitted.] *Terry*, however, precludes this sort of divide-and-conquer analysis.

*Arvizu*, 534 U.S. at 274. The *Banks* Court then faulted the Ninth Circuit for failing to consider *Arvizu* in again systematically eliminating the factors offered by police in support of a no-knock entry:

> Nor did the appeals court cite *United States v. Arvizu*, 534 U.S. 266, 151 L.Ed.2d 740, 122 S. Ct. 744 (2002) (again, from the Ninth Circuit). There, we recently disapproved a framework for making reasonable suspicion determinations . . . by "describ[ing] and clearly delimit[ing]" an officer's consideration of certain factors [citation omitted]. Here, as in *Arvizu*, the Court of Appeals's overlay of a categorical scheme on the general reasonableness analysis threatens to distort the "totality of the circumstances" principle, by replacing a stress on revealing facts with resort to pigeonholes.

*Banks*, 540 U.S. at 42.

¶89    The Court here employs the same flawed analysis. It has proposed a "categorical scheme" which separates and pigeonholes the factors which the police here considered, thereby eliminating all of them. In effect, it has taken the "totality" out of "totality of the circumstances."

¶90    Police here were faced with executing a felony drug warrant in a large structure in which numerous suspects with violent criminal backgrounds were staying. One suspect was

known to have purchased ammunition. The suspects had mounted a surveillance camera. A meth lab was housed in the structure, and the size of the structure would inhibit the ability of police to locate and secure the lab. The numbers of suspects known to be inside could present safety and escape concerns. Shortly before the raid, one suspect yelled suspiciously. From a consideration of the totality of these circumstances, I would conclude that police had objective data from which they could reasonably infer, and from which a reasonable suspicion would arise, that a no-knock entry was necessary.

¶91 Although I concur with the new rule adopted by the Court regarding a magistrate's approval of a no-knock entry, this procedure will not always resolve the issue. Circumstances may arise following the magistrate's issuance of a warrant which may require a last minute, unapproved no-knock entry, as the Supreme Court has recognized:

> When a warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge is acting within the Constitution to authorize a "no-knock" entry. And even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in.

*Banks*, 540 U.S. at 36-37. I would so note in the opinion.

¶92 Further, I would affirm the District Court.


/S/ JIM RICE



Chief Justice Karla M. Gray and Justice John Warner join in the dissent of Justice Rice.

/S/ KARLA M. GRAY
/S/ JOHN WARNER