UNITED STATES of America, Plaintiff–Appellee,

v.

Cedric ALDAZ, Defendant–Appellant.

No. 90–30187.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1990.

Decided Dec. 13, 1990.

Nancy Shaw, Asst. Federal Public Defender, Anchorage, Alaska, for defendant-appellant.

Larry D. Card, Asst. U.S. Atty., Anchorage, Alaska, for plaintiff-appellee.

Before GOODWIN, WRIGHT and NOONAN, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Aldaz appeals an order denying his motion to suppress. The district court denied his motion after finding that the initial seizure of his packages was supported by a reasonable articulable suspicion, and that the delay of his packages was not so unreasonably long as to violate the Fourth Amendment. We affirm.

## BACKGROUND

On Saturday, October 8, 1988, Aldaz mailed an express delivery package from Emmonak, Alaska.[1] The temporary postmaster, Quinlivan, was suspicious of Aldaz and the package. He had been informed by state trooper Piles that Aldaz was suspected of trafficking in illegal drugs.

Quinlivan called Postal Inspector Hertle in Anchorage to inform him of the package. Quinlivan told Hertle that Aldaz was suspected of drug dealing and that he always had money to buy money orders, though he was unemployed. Hertle, who had previously received information from the full-time postmistress in Emmonak that he should watch Aldaz's mail, directed Quinlivan to send him the package by registered mail. Because of the mail schedule, the package did not leave Emmonak until October 11.[2]

On October 11, Aldaz and his girlfriend mailed three additional packages. The manner in which these were mailed aroused Quinlivan's suspicion. Aldaz mailed packages with his girlfriend's return address while she waited in his truck. She mailed packages with his return address while he waited in the truck. Quinlivan promptly reported all of this to Hertle, who directed Quinlivan to send him the three packages by registered mail.

On October 11, the packages left Emmonak with the regular mail sealed in a registered pouch. Mail leaving Emmonak travels to St. Mary's, where it is sorted, then forwarded to various destinations. Because of aircraft maintenance that day, the usual mail flight from St. Mary's to Anchorage was canceled. The mail was sent on a substitute flight, but it did not arrive until 1:00 a.m. on October 13. The packages were received and receipted for by Inspector Hertle at 4:28 p.m., October 13, 1988.[3]

1. Emmonak is a small bush community on the Yukon River, located approximately 700 air miles northwest of Anchorage. Emmonak, like most of Alaska's bush, cannot be reached by any road. Small aircraft are its lifeline to the outside world. All mail to and from Emmonak must travel by air.

2. The express package was mailed after the mail pickup on October 8, October 9 was a Sunday, and October 10 was a holiday.

3. Hertle testified that he did not know which flight carried the packages and that he did not know that the packages had arrived until he signed for them.

He immediately called the Alaska State Troopers K–9 Unit to arrange a drug detection canine sniff. He was told that no dogs were available that evening.[4] At 9:45 a.m. on October 14, the packages were subjected to a drug sniff by a reliable dog. The dog gave a positive alert on all four packages.

Hertle completed the required mail cover forms and proceeded to draft affidavits and search warrants for the three packages mailed on October 11. He then presented them to a federal magistrate. The first warrant was issued by 3:05 p.m. A search revealed three packages containing marijuana.

Information about the fruits of these searches was incorporated into an affidavit seeking a search warrant for the express delivery package mailed on October 8. A warrant was issued and the subsequent lab report disclosed a trace of cocaine in the package.

The district court denied a motion to suppress the evidence obtained in the searches. Aldaz gave a conditional guilty plea to distributing a controlled substance and unlawful use of a communications facility, preserving his right to appeal.

## DISCUSSION

Aldaz argues that the initial seizure of his packages and the length of their detention by the postal authorities violated the Fourth Amendment. A warrantless seizure and detention presents a mixed question of law and fact reviewed de novo. *United States v. Dass*, 849 F.2d 414, 415 (9th Cir.1988).

■ Postal authorities may seize and detain packages if they have a reasonable and articulable suspicion of criminal activity. *See United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970); *cf. United States v. Place*, 462 U.S. 696, 700–06, 103 S.Ct. 2637, 2641–44, 77 L.Ed.2d 110 (1970). Because Quinlivan had

neither authority to seize packages nor to apply for a warrant, we examine this issue using the information available to Inspector Hertle, who did have such authority.

■ At the time of the first seizure, Hertle had information from independent sources that could lead him to believe that Aldaz was using the mail for drug trafficking. The permanent postmistress had warned him to be suspicious of Aldaz's mail.[5] He knew that state police suspected Aldaz of sending drugs through the mail. Quinlivan relayed information that Aldaz had money, but no job. When he authorized the seizure of the other three packages, Hertle also had heard about the suspicious manner in which Aldaz mailed them.

We find the information known by Hertle was sufficient to allow him to have an articulable suspicion that Aldaz was dealing in drugs by mail. He could reasonably authorize the detention of Aldaz's packages for further investigation.

■ We turn to Aldaz's argument that the length of the detention of the packages by postal authorities violated the Fourth Amendment. The Supreme Court has said that, even if the initial seizure of a mailed package is valid, a continued detention could at some point become an unreasonable seizure within the meaning of the Fourth Amendment. *United States v. Van Leeuwen*, 397 U.S. 249, 252, 90 S.Ct. 1029, 1032, 25 L.Ed.2d 282 (1970). The length of the detention here, however, was not unreasonable.

In *Van Leeuwen*, circumstances surrounding the mailing of two packages aroused the suspicion of a postal clerk in Mount Vernon, Washington. He informed a police officer, who had also noticed suspicious circumstances surrounding the mailing of the packages. *Id.* at 250, 90 S.Ct. at 1031. The packages were detained while

---

4. Anchorage at that time had only two dogs trained in drug detection.

5. She did not specify why he should be suspicious, but Hertle testified that "most native Post-

masters will not say something direct, but generally say that you better watch the mail for so-and-so."

Seattle Customs officers investigated further.

Later that day, Seattle Customs discovered that one of the addressees was under investigation for trafficking illegal coins. Because of the time difference between Seattle and Nashville, Seattle Customs could not get additional information about the second addressee until the following day. The information obtained then showed that the second addressee was also suspected of trafficking illegal coins. Seattle Customs then applied for search warrants. Before search warrants could be issued, transferred from Seattle to Mount Vernon and executed, 29 hours had elapsed from the initial seizure of the packages.

The Court held that on the facts before it, the 29–hour detention was neither unreasonable nor a violation of the Fourth Amendment. *Id.* at 253, 90 S.Ct. at 1032. The distance between Seattle and Mount Vernon and the unavoidable delay in communicating with Nashville lengthened the warrant application process.

This court applied *Van Leeuwen* in *United States v. Hillison,* 733 F.2d 692 (9th Cir.1984). After finding the facts to be similar to those in *Van Leeuwen,* we observed that the nine-hour detention in *Hillison* was far less than the 29–hour delay in *Van Leeuwen.* We held that the *Hillison* detention did not violate the Fourth Amendment. *Id.* at 696.

In *United States v. Dass,* 849 F.2d 414, 415 (9th Cir.1988), this court examined the reasonableness of detaining packages for seven to 23 days. Agents on the island of Hawaii collected suspicious packages from 10 different island post offices and transported them to a central location. *Id.* at 416. Within two days of the seizures, trained dogs did drug sniffs on the packages and "alerted" on a large number of them. The officers sought search warrants for 441 of these packages.[6] *Id.*

The majority in *Dass* found the detentions unreasonably long and affirmed the district court's suppression of the evidence. The majority acknowledged that the Supreme Court had upheld a 29–hour delay, but stated "[W]e are reluctant to extend the *Van Leeuwen* outer boundary of 29 hours to a period not measured in hours, but in days and weeks." *Id.* at 415.

Aldaz argues that *Hillison* and *Dass* create a bright-line rule that delays of more than 29 hours violate the Fourth Amendment.[7] We reject this argument. In dictum, the *Dass* court suggested that *Hillison* may have interpreted *Van Leeuwen* as creating an outer boundary of 29 hours, but a close reading shows that *Hillison* did not do so.

The *Hillison* court used *Van Leeuwen* as a guide because of factual similarities. It acknowledged that its facts were very similar to those in *Van Leeuwen* before holding, based on *Van Leeuwen,* that the nine-hour delay before it was not unreasonable. It did not establish or apply a bright-line rule.

■ The *Dass* court similarly acknowledged that the reasonableness of the 29–hour delay in *Van Leeuwen* depended upon its facts. Although the *Dass* majority refused to stretch 29 hours into days or weeks, it never stated that it was adopting a bright-line rule. When *Dass* is read in harmony with *Van Leeuwen* and *Hillison,* a test emerges: based upon the facts, was the delay in handling the packages unreasonable?[8]

We examine the reasonableness of the delay here by assessing the reasonableness of its components: (1) the time taken transferring the packages from Emmonak to Anchorage, (2) the time between the arrival of the packages and their receipt by Inspector Hertle, (3) the time between his receipt of the packages and the drug sniffs and (4)

---

**6.** The large number of packages and understaffing were the major cause of the delays.

**7.** Aldaz relies in part on the dissenting opinion in *Dass,* where Judge Alarcon interpreted the majority's opinion as creating an outer limit of 29 hours. *See also United States v. Mayomi,* 873

F.2d 1049, 1054 n. 6 (7th Cir.1989) (interpreting *Dass* as creating an outer limit of 29 hours).

**8.** The First and Seventh Circuits have also applied this test. *See United States v. LaFrance,* 879 F.2d 1, 4 (1st Cir.1989); *United States v. Mayomi,* 873 F.2d 1049, 1054 (7th Cir.1989).

the time between the drug sniffs and the execution of the warrants. Under the facts before us, the detention and delay of Aldaz's packages were not unreasonable.

First, the delay caused by the transfer of the packages from Emmonak to Anchorage was not unreasonably long. In contrast to *Dass*, drug-sniffing dogs were not available near the place of seizure. Rather, the nearest trained dogs were 700 air miles away. The magistrate concluded that it was unreasonable to expect postal authorities to procure the presence of drug-detecting dogs in a small bush community like Emmonak. We agree.

The time consumed in transferring the packages from Emmonak to Anchorage simply reflects the facts of life in the Alaska bush. Even the defendant conceded the difficulties of traveling to the remote communities of interior Alaska. As the magistrate found and the defendant recognized, flexible standards are necessary to permit enforcement of our anti-drug laws in these remote communities.

The magistrate considered evidence concerning the routing of mail from Emmonak to other places in Alaska. He found that airline schedules delayed the first package by at least 72 hours. While he noted that the second, third and fourth packages were delayed about 51½ hours by their transfer to Anchorage, he found that without the seizure they would not have arrived at their destinations any sooner. We agree that delays were inevitable for all packages, and that the government should not be charged with the inevitable delays of bush mail. No unreasonably long delay resulted from transferring these packages to Anchorage.

Nor did an unreasonably long time elapse between arrival of the packages in Anchorage and their receipt by Inspector Hertle. He did not know which flight was carrying them. He testified that he is routinely notified when registered mail packages have arrived for him, and that he did not receive notice until shortly before he signed for the material. His actions and the delay in his receipt of the packages were reasonable.

The time between Hertle's receipt of the packages and their submission to a canine drug sniff also did not constitute an unreasonably long delay. Hertle received the packages at the end of the workday and called immediately to arrange a drug sniff. He could not arrange one that evening.[9] The sniff occurred at the first available time, the next morning. These facts resemble the delay found reasonable in *Van Leeuwen*, when Seattle Customs had to wait until the next morning for information about the Nashville addressee.

Finally, the five hours between the drug sniffs and the execution of the warrants did not constitute an unreasonable delay. It was largely attributable to the administrative requirements for securing search warrants.

## CONCLUSION

The information available to Inspector Hertle permitted him to form a reasonable and articulable suspicion that Aldaz was involved in criminal activity. The initial seizure and detention of the packages did not violate Aldaz's Fourth Amendment rights.

Under the facts before us, the detention of these packages was not so unreasonably long as to violate the Fourth Amendment. Most of the delay stemmed from the conceded difficulty of traveling in interior Alaska, which is beyond the government's control. The remaining delays were not unreasonable under the circumstances.

AFFIRMED.

---

9. There is no evidence to suggest that Hertle would have refused to hold the drug sniff that evening, if it could have been arranged. We do not decide whether this segment of the delay would have been reasonable if Hertle had refused to stay late.