**UNITED STATES of America, Plaintiff,**

**v.**

**Robert DUPRAS; Michael Wallace; and Douglas Anderson, Defendants.**

**No. CR 97–034–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

Oct. 8, 1997.

James T. Raney, Ranney Law Office, Missoula, MT, for Robert Dupras.

Laurence J. Ginnings, Ginnings Law Office, Missoula, MT, for Michael Wallace.

Craig Shannon, Shannon Law Office, Missoula, MT, for Douglas A. Anderson.

Kris A. McLean, Office of U.S. Attorney, Missoula, MT, for U.S.

ORDER SUPPRESSING EVIDENCE·

MOLLOY, District Judge.

## I. BACKGROUND

Defendants were named in a four-count indictment charging them with conspiring to manufacture illegal drugs, possession with intent to distribute illegal drugs, and distribution of methamphetamine, an illegal drug. Dupras filed a Motion to Suppress all evidence obtained during a search of his apartment on March 18, 1997. Anderson joins in the motion to suppress.[1] An evidentiary hearing on the motion to suppress was held on September 19, 1997. I find it necessary to grant the motion to suppress for the reasons set forth below.

## II. Facts

Montana State District Judge Ed McLean issued a search warrant on March 17, 1997. The warrant authorized law enforcement to locate and seize certain items of personal property at Dupras' apartment and in his truck. Within the four corners of the warrant there is no authorization to effect a no-knock entry to the premises described in the warrant. Nonetheless, the parties stipulated that the state judge intended the warrant to be a no-knock warrant.

### A. The Application

The application for the search warrant was by sworn affidavit of Detective Scott Brodie of the Missoula Police Department. The 13 page application averred that a variety of drug manufacturing equipment was likely to be found at the Dupras apartment. Pages 2–7 contain boilerplate generalizations about the habits and practices of drug manufacturers and dealers. These statements, while based on Detective Brodie's training and experience, don't refer to the defendants in this case.

The meat of Brodie's application states that around January 13, 1997, a confidential informant of unknown reliability, CI–1, told him that Dupras was manufacturing methamphetamine at his apartment. CI–1 said that Dupras had installed video surveillance on the outside stairs leading up to the apartment.

Brodie and another detective then conducted a surveillance of Dupras' apartment at 513 South 1st West. The detectives confirmed that a stairway led to the upstairs apartment as described by CI–1 but made no mention of surveillance equipment on the stairway.

Two months later on March 14, 1997, another confidential informant, CI–3, contacted Detective Peterson and told him that Dupras planned to produce a batch of methamphetamine that weekend (March 14–16). At approximately 3:00 p.m. on March 15, Detectives Brodie and Trollope once again conducted surveillance on the Dupras apartment. They noted four similar models of Datsun sports cars parked on the south side of the apartment, one of which was registered to Robert Dupras.

Around 4:30 p.m. on St. Patrick's Day, CI–3 again contacted Detective Peterson suggesting that Dupras had begun to manufacture a batch of methamphetamine. Detective Brodie again surveilled the South 1st West apartment. At 5:00 p.m. he saw Dupras drive up in a 1984 red Datsun pick-up. None of the previously unidentified Datsun sports cars looked as though they had moved between surveillance times.

The search application then talks about the criminal history of Dupras and those he was suspected of being involved with. None but Dupras and Wallace were listed as having prior arrests. Dupras' history included, *in-*

---

1. The case against Defendant Wallace was dismissed after Wallace's successful suicide attempt.

*ter alia,* possession of cocaine and heroin and resisting arrest. Wallace's criminal history included felony offenses of possession of dangerous drugs and felony assault.

Brodie concluded his affidavit with the following:

> Based upon Detective Brodie's knowledge and training with regard to the fact that drug evidence is often easily and quickly disposed of and the very real potential that drug traffickers maintain and possess a variety of weapons to protect their illegal enterprise, and based upon the previously mentioned violent criminal histories that have been outlined in this affidavit of some of the possible suspects involved in this investigation, Detective Brodie requests authorization to enter this residence **without knocking or announcing in order to protect the officers involved in the search and to protect evidence that may be located in and upon the premises.**

Application for Search Warrant at 12–13 (emphasis added).

### B. SWAT Team

Detective Jim Neumeyer is one of the Missoula Police Department SWAT team leaders. He testified about the execution of the warrant. The SWAT team gathered at about 5:00 a.m. on March 18, 1997, and reviewed the plan of operation. In the early morning of March 18th, the SWAT team approached the apartment unobserved, and then moved silently up the stairs to the door of the apartment. Without knocking and without announcing their presence or authority, the team smashed the door down with a steel battering ram swung by two police officers.

According to Neumeyer, once a warrant is obtained, the swat section does a risk analysis concerning the service of the warrant to see if a no-knock entry would be advisable under the circumstances. The issuing magistrate judge is not involved in, or appraised of The Risk Analysis for Planned Operations ("Risk Analysis"). (Government Exhibit 1).

### C. The Risk Analysis

The risk analysis names three primary suspects—Rob Dupras, Randy Tango and Mike Wallace.

Under the "Known or Suspected Record of Violence" section of the risk analysis, Wallace's felony assault is noted. However, on cross-examination Neumeyer conceded defense counsel's assertion that the felony assault, while perhaps violent, resulted from a domestic dispute. Before the no-knock entry, Neumeyer acknowledged that the criminal records were available to him but he did not check to determine the nature of the assault.

Section 5 of the Risk Analysis, indicates the apartment was occupied by persons "Mentally Unstable," which it equates with, "Drug abusers." No particulars or details are provided on any of the individuals. The Risk Analysis noted that no weapons were expected to be at the apartment. The site wasn't booby-trapped or under mechanical or armed counter surveillance. The site was believed to be fortified by a "deadbolt and chair or something else behind the door."

Officer Neumeyer testified that after completing the Risk Analysis he concluded that a no-knock entry was justified. He testified that no other factors came into play at the scene. The operation went smoothly. The SWAT unit was not observed and took the occupants by surprise when the door was smashed down.

## III. DISCUSSION

### A. The Fourth Amendment

The Fourth Amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. Defendants argue that the search was in violation of the Fourth Amendment because a no-knock entry to the premises was not reasonable under the circumstances.

The Fourth Amendment embodies the common-law principle that police officers should first knock and announce their presence and authority before attempting a forcible entry to a home. *Richards v. Wisconsin,* — U.S. —, —, 117 S.Ct. 1416, 1418, 137 L.Ed.2d 615, 620 (1997) (citing *Wilson v.*

*Arkansas,* 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)). Even so, the Fourth Amendment does not "mandate a rigid rule of announcement." *Id.* at ——, 117 S.Ct. at 1418, 137 L.Ed.2d at 620. Instead, the courts must determine whether an unannounced entry is reasonable under the particular circumstances of the case. *Id.*

■ It is reasonable for police to make an unannounced entry if circumstances present a threat of physical violence or the likelihood that evidence would be destroyed. *Richards,* —— U.S. at ——, 117 S.Ct. at 1420, 137 L.Ed.2d at 622. Even though felony drug investigations often involve both these factors, that generalization does not dispense with the need for a "case-by-case evaluation of the manner in which a search was executed." —— U.S. at ——, 117 S.Ct. at 1420, 137 L.Ed.2d at 623.

■ In *Richards v. Wisconsin* the Court held there could be no blanket exception to the knock-and-announce requirement when executing a search warrant in a felony drug investigation. *Id.* at ——, 117 S.Ct. at 1421–22, 137 L.Ed.2d at 624. Here, the court must review "whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." *Id.* The standard is whether the police had a "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* "This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id.*

**B. No-knock Exigencies**

■ There are two types of dangerous or futile circumstances—those that are foreknown and those unexpected exigencies that arise on the scene. *United States v. VonWillie,* 59 F.3d 922, 926 (9th Cir.1995). Here, it was the testimony of the officer in command of the SWAT team that no unexpected exigencies arose at the scene. Thus, the reasonableness of the police action must be judged solely on what they knew in advance of executing the warrant.

The information available to the police in advance of executing the warrant was contained in the application for the no-knock search warrant and the Risk Analysis. Under the circumstances of this case, it was not reasonable to execute a no-knock search. On the basis of the information contained in the warrant application, it was unreasonable for the SWAT team to make an unannounced, forcible, and destructive entry upon the premises to be searched.

The application for search warrant is comprised largely of generalities regarding the habits of drug manufacturers and distributors. While such information may be relevant to establishing probable cause, it carries no weight in determining the reasonableness of a no-knock entry. In fact, it is exactly the sort of information that the Court in *Richards* said should **not** form the basis for a no-knock search. *Richards,* —— U.S. at —— – ——, 117 S.Ct. at 1420–21, 137 L.Ed.2d at 623 ("creating exceptions to the knock-and-announce rule based on the 'culture' surrounding a general category of criminal behavior" raises serious concerns because such an exception "contains considerable overgeneralization").

Next, the individual profiles in the search warrant application do not present the element of danger justifying the sort of no-knock entry seen here. The application stated that Dupras had two drug charges and an assault charge from Yakima in 1990. At the hearing there was unrebutted testimony that these charges had been dismissed. The application also stated that Wallace had been charged with felony assault. At the evidentiary hearing, defense counsel engaged in this colloquy with Detective Neumeyer:

Q. And as far as Mr. Wallace goes, in the application you talk about a felony assault. You understand that was regarding a domestic problem, with his wife?

A. The records don't indicate. You would have to—I would have to look up the actual police report.

Q. And those records are in your possession at the police station, they're within your reach?

A. They're within my reach, yes.

Q. If you care to look, you could have found them?

A. Yes.

The application is even more tenuous in connecting Dupras with Wallace, a relationship described as "unknown." The connection between the two was made on the basis of CI–3's information of February 28, 1997, stating that Wallace had been at Dupras' apartment within the past two months. Detective Neumeyer testified that Wallace had not been observed by surveillance at the Dupras residence before the search, and his vehicle was not at the scene. Whatever their relationship, it did not justify a no-knock search under the facts here.

Furthermore, the Risk Analysis discounted the possibility of encountering any sort of armed resistance or surveillance. No weapons were expected at the scene. No weapons were observed on any of the occasions when police surveilled Dupras' apartment.

Thus, the only previous violent criminal activity alleged in the application was the domestic dispute between Wallace and his wife. In sum, the element of danger here, if any, did not raise concern for the safety of the police or the residents of the house to a level that would justify a no-knock entry.

This conclusion is borne out by the cases. For example, in *United States v. Stowe*, 100 F.3d 494 (7th Cir.1996), a no-knock entry was justified due to the danger in apprehending a convicted felon operating under an alias. There, a confidential source had seen a gun in the apartment and observed that the apartment had steel doors. *Id.* at 496. In *United States v. Jewell*, 60 F.3d 20 (1st Cir. 1995), the court upheld a no-knock entry. The circumstances presented a threat of physical violence due to the defendant's record of violent criminal offenses and the fact that a pit bull was at the residence. *Id.* at 23 (citing *Wilson v. Arkansas*, 514 U.S. 927, 931, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976 (1995)); *United States v. Singer*, 943 F.2d 758, 759 (7th Cir.1991) (police received an anonymous tip prior to the search that the defendant possessed firearms and had made threats against the police).

By contrast, the circumstances here presented no identifiable danger to the police that would justify the forcible entry at the Dupras residence. The only factor remaining is the reference in the Risk Analysis to the target site being "fortified" with a deadbolt and a chair or something behind the door. Such "fortification" is not beyond that contemplated by the average citizen and does not justify smashing down an entryway with a steel battering ram. *Compare Stowe, supra* (apartment fortified with steel doors justified no-knock entry); *United States v. Johnson*, 643 F.Supp. 1465, 1471 (D.Or.1986) (exigent circumstances justified no-knock entry where "apartment was protected by a heavy wood and metal door that opened out," was difficult to open, and "so heavily fortified that one officer lost his balance when he first leaned into the pry bar, and fell down a staircase").

This conclusion is bolstered by the nature of the evidence sought in the search. The warrant was obtained on the basis of information that a methamphetamine "cook" was planned and the execution of the warrant timed early on the morning when CI–3 said the "cook" would be completed. The list of evidentiary items in the search warrant application were unlikely to be destroyed or disposed of in an instant.

Under the circumstances presented here, I find that a forcible, destructive no-knock warrant was unreasonable and in violation of the Fourth Amendment.

## C. The Particularity Requirement

■ The government contends that the search should be upheld because the warrant issued by Judge McLean was a valid no-knock search warrant. In some States magistrates have statutory authority to issue no-knock warrants ahead of time. *Richards*, —— U.S. at —— n. 7, 117 S.Ct. at 1422 n. 7, 137 L.Ed.2d at 625 n. 7. The Court observed that "[t]he practice of allowing magistrates to issue no-knock warrants seems entirely reasonable when sufficient cause to do so can be demonstrated ahead of time." *Id.*

Montana has no statute authorizing magistrates to issue no-knock warrants. More

importantly, the warrant itself contained no authorization for a no-knock entry. Detective Neumeyer testified that Judge McLean intended the warrant to authorize a no-knock entry. He testified that it was Judge McLean's practice not to specifically authorize no-knock entry if requested in the application but only to specifically deny such authorization if he had concerns. In other words, if the warrant application requested no-knock authority, and Judge McLean does not specifically deny it, then the police assume, and Judge McLean intends, that it is granted. At the hearing, defense counsel stipulated that Judge McLean meant the warrant to be read as a no-knock warrant.

I do not believe the Fourth Amendment can be construed in such a way. The Fourth Amendment provides that "no Warrant[ ] shall issue" unless it "particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const. Amend.IV. The particularity requirement of the Fourth Amendment cannot be based on a telepathic understanding between the neutral magistrate and law enforcement officers. The police only have the authority expressly granted in the warrant. Similarly here, because the warrant did not authorize a no-knock entry, the police were not entitled to execute a no-knock search absent some exigent circumstance that took place at the scene. None did so the motion to suppress must be granted.

## IV. CONCLUSION

There was probable cause for a search warrant in this case. Nonetheless, the government failed to prove that specific exigencies existed that would have allowed a no-knock search. No exigency was established by the pre-search knowledge regarding either fortification or police safety. Under the circumstances, the no-knock entry was unreasonable.

Wherefore, IT IS ORDERED:

(1) Defendants' Motion to Suppress is **GRANTED.**

(2) Trial in this case is set for October 27, 1997, at 8:45 a.m. in the Russell Smith Courthouse, Missoula.