No. 04-266

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 88

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

JAMES B. OCHADLEUS,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DC 2003-0094
The Honorable Susan P. Watters, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Nancy G. Schwartz, LaRance Syth & Schwartz, Billings, Montana

        For Respondent:

            Honorable Mike McGrath, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone
County Attorney, Sheila Kolar, Deputy County Attorney


        Submitted on Briefs:  April 5, 2005

            Decided:  April 11, 2005

Filed:

_____
            Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     James B. Ochadleus appeals his conviction in the District Court for the Thirteenth Judicial District, Yellowstone County, of Criminal Possession of Dangerous Drugs with Intent to Distribute. We affirm.

¶2     We address the following issues on appeal:

¶3     1.   Whether the District Court properly denied Ochadleus's motion to suppress evidence seized pursuant to a search warrant based on Ochadleus's claim that the Postal Inspector did not have reasonable grounds to subject a suspicious package placed in the United States Mail to a canine sniff.

¶4     2.  Whether the District Court properly denied Ochadleus's motion to suppress based on his claim that law enforcement officers failed to follow the "knock and announce" rule prior to executing a warrant to search his residence.

**Factual and Procedural Background**

¶5     Postal Inspector Mark Morse has been employed by the United States Postal Inspectors Office for over 18 years.  In that position, Inspector Morse investigates crimes in Montana that affect the United States Postal Service and the United States Mail.

¶6     On January 30, 2003, while profiling Express Mail packages at the Billings Post Office, Inspector Morse discovered a package that he thought looked suspicious.  Inspector Morse testified at the suppression hearing in this matter that his suspicions were aroused because the package had a handwritten label; the zip code the customer filled out was different from the actual zip code of mailing; all of the seams of the package were taped; and

2

the package originated from Tucson, Arizona. Inspector Morse believed these facts to be significant because Express Mail is a premium service used primarily by businesses and most express mail packages have typed labels rather than handwritten labels. In addition, Inspector Morse explained that taped seams are a common characteristic of packages containing contraband and that Tucson, Arizona is a known drug distribution area.

¶7 Based on this information, Inspector Morse spoke with the special delivery carriers and learned that they had delivered three other Express Mail packages to the same address within the past six weeks. Consequently, Inspector Morse took the package to the Drug Enforcement Agency (DEA) in downtown Billings to have them conduct a canine sniff of the package.

¶8 Officer Tim Vicars is a canine handler with the Billings Police Department. He and his dog, Duke, were called to the DEA office to investigate the suspicious package. Upon arriving at the DEA office, Officer Vicars observed four or five different-sized packages on the floor a few feet apart. Inspector Morse informed Officer Vicars that he suspected one of the packages may contain illegal drugs, but he did not tell Officer Vicars which one he suspected. Officer Vicars deployed Duke to sniff the packages and Duke alerted on the same package that Inspector Morse had brought from the Post Office.

¶9 Thereafter, Inspector Morse obtained a search warrant from the Federal Magistrate to inspect the contents of the package. In the package, Inspector Morse found 495.8 grams of a green leafy substance that field-tested positive for marijuana. Based on this evidence, Inspector Morse also obtained a warrant to search the intended destination of the package--a

3

residence at 709 North 26th Street in Billings. Later that day, Inspector Morse, dressed as a mail carrier, delivered the package of marijuana to that location. Shortly thereafter, five officers with the Billings Police Department's City-County Special Investigations Unit (CCSIU) and the DEA executed the search warrant.

¶10 To enter the residence, the officers had to pass through a screen door and a wooden door with a window that led into an enclosed porch. About five feet from this porch entrance was another wooden door with a window that led into the residence itself. Neither of the windows in the doors had any type of curtain or other covering. Detective Jamie Schillinger with the CCSIU entry team later testified that he thought the wooden door at the porch entrance was open prior to the officer's entry.

¶11 At the time the officers executed the search warrant, Ochadleus, his roommate Les Wright, and another male were sitting in the living room when Wright saw someone pass by a window. Wright got up and went to the door to see who was there. When he looked through the window of the door, Wright saw a man with "a shield and a gun." Wright remembered seeing one of the officers wearing a tie-dyed t-shirt with a marijuana leaf on it, but various officers testified that they were all wearing law enforcement attire with identifying insignia. According to Wright, he heard one of the officers say "freeze, get on the ground, you're under arrest." Wright claimed that after only a two-second delay from the time he saw the officers, they rammed in the door.

¶12 Detective Rick Ballantyne, who led the entry team, testified that as soon as he approached the door to the residence he saw a man at the window of the door and made

4

direct eye contact with him. Detective Ballantyne further testified that when he called out "police, search warrant, open the door," the man looked directly at him and moved towards the door as if to open it. However, when Detective Ballantyne again called out "police," the man backed away from the door. As soon as he saw the man backing away, Detective Ballantyne used a battering ram on the door to gain entry into the residence.

¶13 Detective Schillinger later estimated that there was a five-to-seven second delay between the time Wright made eye contact with the officers and the time officers forced their way into the residence. In the search, officers found the package of marijuana that had just been delivered to the residence, miscellaneous drug paraphernalia, scales, cash and other illegal drugs.

¶14 On February 4, 2003, the State filed an Information charging Ochadleus with Criminal Possession of Dangerous Drugs with Intent to Distribute, a felony, in violation of § 45-9-103, MCA. Ochadleus pled not guilty to the charge and, on April 10, 2003, he filed a motion to suppress the evidence seized in the search of his home. Ochadleus argued in his motion that Inspector Morse did not have sufficient grounds to subject the package to a canine sniff prior to obtaining a search warrant and that the officers who executed the search warrant for his residence did so in violation of the federal "knock and announce" statute and the Fourth Amendment to the United States Constitution. After conducting a suppression hearing, the District Court entered its findings of fact, conclusions of law and order denying Ochadleus's motion to suppress.

5

¶15 On September 10, 2003, Ochadleus filed with the District Court his Acknowledgment of Waiver of Rights by Plea of Guilty and Plea Agreement With Reservation of Right to Appeal wherein he agreed to plead guilty to the charge of Criminal Possession of Dangerous Drugs with Intent to Distribute in exchange for the State's recommendation that the court impose a seven-year suspended sentence. Ochadleus reserved his right to appeal the District Court's denial of his motion to suppress. The court subsequently deferred imposition of Ochadleus's sentence for three years based upon his successful completion of numerous conditions. Ochadleus appeals the District Court's Judgment and Order.

**Standard of Review**

¶16 We review a district court's grant or denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Lanegan*, 2004 MT 134, ¶ 10, 321 Mont. 349, ¶ 10, 91 P.3d 578, ¶ 10 (citing *State v. Roberts*, 1999 MT 59, ¶ 11, 293 Mont. 476, ¶ 11, 977 P.2d 974, ¶ 11). A trial court's findings are clearly erroneous if they are not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Lanegan*, ¶ 10.

**Issue 1.**

¶17 *Whether the District Court properly denied Ochadleus's motion to suppress evidence seized pursuant to a search warrant based on Ochadleus's claim that the Postal Inspector did not have reasonable grounds to subject a suspicious package placed in the United States Mail to a canine sniff.*

¶18 The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." The United States Supreme Court determined in *United States v. Van Leeuwen* (1970), 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282, that this included first-class mail, such as letters and sealed packages. However, the Supreme Court also held in *Van Leeuwen* that first-class mail is not beyond the reach of all inspection. *Van Leeuwen*, 397 U.S. at 252, 90 S.Ct. at 1032.

¶19 The Ninth Circuit Court of Appeals has stated that "[p]ostal authorities may seize and detain packages if they have a reasonable and articulable suspicion of criminal activity." *United States v. Aldaz* (9th Cir. 1990), 921 F.2d 227, 229, *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). A reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person [or object] detained is [involved] in criminal activity." *United States v. Gill* (9th Cir. 2002), 280 F.3d 923, 928 (quoting *United States v. Lopez-Soto* (9th Cir. 2000), 205 F.3d 1101, 1105).

¶20 In the case before us on appeal, Ochadleus contends that Inspector Morse did not have a reasonable and articulable suspicion that the package in question contained illegal drugs and that even if Inspector Morse had sufficient evidence to temporarily detain the package, he lacked sufficient evidence to transport the package to the DEA office for further investigation. The State maintains that Inspector Morse had reasonable cause to detain the package when it exhibited characteristics consistent with the Postal Inspection Services' drug

7

package profile. In addition, the State argues that Inspector Morse's action of briefly detaining the package and taking it to the DEA office for a canine sniff did not constitute a seizure because it did not deprive Ochadleus of his possessory interest in the package since the package was promptly delivered to him.

¶21 The *Van Leeuwen* case is analogous to the case *sub judice*. The defendant in *Van Leeuwen* mailed a 12-pound package to California and one to Tennessee. He insured both packages for $10,000. Although the defendant had British Columbia license plates, he mailed the packages from a small border town in the United States. The return addresses on both packages were fictitious. A postal clerk detained the packages to allow further investigation into their suspicious nature. Subsequent research revealed that the addressees for both packages were being investigated for trafficking in illegal coins and a search warrant ultimately revealed that both packages contained illegal gold coins. *Van Leeuwen*, 397 U.S. at 249-50, 90 S.Ct. at 1031.

¶22 The Supreme Court concluded in *Van Leeuwen* that the postal clerk had sufficient justification to detain the packages without a warrant and that detention of the packages for 29 hours was not unreasonable under the circumstances. *Van Leeuwen*, 397 U.S. at 252-53, 90 S.Ct. at 1032-33. The Supreme Court stated:

> No interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day when they were deposited. The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained.

8

*Van Leeuwen*, 397 U.S. at 253, 90 S.Ct. at 1032. *See also Gill*, 280 F.3d at 929 ("[T]he main Fourth Amendment interest in a mailed package attaches to the privacy of its contents, not the speed with which it is delivered.").

¶23    Various circuit courts have extended the rationale of *Van Leeuwen* to packages suspected of containing drugs sent by United States Mail or private courier services to justify detaining suspicious packages until probable cause for a search warrant could be established by conducting canine sniffs of the packages. *See, e.g., United States v. LaFrance* (1st Cir. 1989), 879 F.2d 1, 4 (holding that the seizure of a Federal Express package on reasonable suspicion that it contained contraband was lawful); *United States v. Mayomi* (7th Cir. 1989), 873 F.2d 1049, 1053-54 (holding that when the facts create a reasonable suspicion and the investigation period is reasonable, the warrantless detention of mail sent to a private mailbox service until a canine sniff could establish probable cause for a search warrant did not violate the Fourth Amendment); *Aldaz*, 921 F.2d at 229 ("Postal authorities may seize and detain packages if they have a reasonable and articulable suspicion of criminal activity."); *United States v. Lux* (10th Cir. 1990), 905 F.2d 1379, 1382 ("A temporary detention of mail for investigative purposes is not an unreasonable seizure when authorities have a reasonable suspicion of criminal activity."); *United States v. Banks* (11th Cir. 1993), 3 F.3d 399, 403, *cert. denied*, 510 U.S. 1129, 114 S.Ct. 1097, 127 L.Ed.2d 410 (1994) ("reasonable, temporary detention of a reasonably suspicious postal package prior to establishing probable cause for issuance of a search warrant for the time necessary to obtain a drug detection canine or otherwise conduct an investigation does not violate the Fourth Amendment.").

9

¶24 In *Banks*, a narcotics investigator obtained the delivery notice for an Express Mail package from a reliable confidential informant. The informant told the investigator that he knew the individuals who sent the package and that he believed the package contained cocaine. The informant also stated that the Postal Service had attempted delivery of the package that day. Based on this information, the investigator met with a postal inspector who verified that a package meeting the informant's description was in the Express Mail and that delivery had been attempted. After a narcotics canine gave a positive alert to the package, the investigator obtained a warrant to search the package. It contained 106.4 grams of powder cocaine and 45.6 grams of cocaine base. *Banks*, 3 F.3d at 400-01.

¶25 The package was resealed and a second delivery notice advising that the package could be picked up at the Post Office was left at the address on the package. A team of federal and local officers maintained surveillance at the Post Office. The defendant was arrested when he presented and signed the delivery slip to obtain the package. He was indicted for conspiracy to distribute cocaine and cocaine base as well as possession with intent to distribute cocaine. The defendant moved to suppress evidence obtained by the search warrant arguing that the initial detention of the package was not based upon a reasonable suspicion that the package contained contraband. *Banks*, 3 F.3d at 401. However, the Eleventh Circuit Court of Appeals held that the information obtained from the informant provided reasonable suspicion for the postal inspector to detain the package and subject it to a canine sniff. *Banks*, 3 F.3d at 403.

¶26    Along those same lines, the Tenth Circuit Court of Appeals determined in *Lux* that law enforcement officers had reasonable suspicion to detain an Express Mail package addressed to the defendant and subject it to a canine sniff because the package met three of the  characteristics of the drug package profile developed by the Postal Inspection Service. *Lux*, 905 F.2d at 1382.  Some of these characteristics are:  (1) size and shape of the package; (2) package taped to close or seal all openings; (3) handwritten or printed labels; (4) unusual return name and address; (5) unusual odors coming from the package; (6) fictitious return address; and (7) destination of the package.  *Lux*, 905 F.2d at 1380.

¶27    The Ninth Circuit Court of Appeals used these same characteristics in *United States v. Hernandez* (9th Cir. 2002), 313 F.3d 1206, 1211, *cert. denied*, 538 U.S. 1023, 123 S.Ct. 1953, 155 L.Ed.2d 867 (2003), to conclude that there was reasonable cause to detain the package in question in that case.  The Ninth Circuit noted that this profile "does not contain completely arbitrary criteria," as it was developed at a national level and was based upon information gathered from national investigations of narcotics mailings.  *Hernandez*, 313 F.3d at 1211 (citation omitted).

¶28    The Ninth Circuit also acknowledged in *Hernandez* that a person who voluntarily places items in the United States Mail for delivery retains a limited possessory interest in the mailed item.

> "[T]he mere detention of mail not in [the addressor's] custody or control amounts to at most a minimal or technical interference with [the addressor's] person or effects, resulting in no personal deprivation at all."

11

*Hernandez*, 313 F.3d at 1209 (quoting *United States v. Place* (1983), 462 U.S. 696, 718 n.5, 103 S.Ct. 2637, 2650 n.5, 77 L.Ed.2d 110 (Brennan, J., concurring)). The recipient, on the other hand, has a reasonable expectation that postal employees will not detain mail beyond the normal delivery date and time.

> In other words, an addressee's possessory interest is in *the timely delivery of a package*, not in "having his package routed on a particular conveyor belt, sorted in a particular area, or stored in any particular storing bin for a particular amount of time."

*Hernandez*, 313 F.3d at 1210 (quoting *United States v. Demoss* (8th Cir. 2002), 279 F.3d 632, 639 (Hansen, J., concurring)) (emphasis added).

¶29 In addition, the Ninth Circuit Court of Appeals stated in *United States v. England* (9th Cir. 1992), 971 F.2d 419, 420, that it is "the extent of the interference with the defendant's possessory interest in his property, not the physical movement of the property, that determines whether a seizure has occurred." The defendant in *England* deposited two packages in the United States Mail for Express Mail delivery. The packages were deposited in the mail on different dates from different postal stations. Postal inspectors at each station suspected that the packages contained narcotics. One of the postal inspectors took the package in his possession from the postal station to a nearby police station to subject the package to a canine sniff. A canine sniff on the other package was conducted at that postal station. The canines alerted to both packages. *England*, 971 F.2d at 420. The Ninth Circuit explained that a "seizure" of property occurs "when there is some meaningful interference with an individuals possessory interests in that property" and that absent such interference,

12

there can be no seizure under the Fourth Amendment. *England*, 971 F.2d at 420 (citing *United States v. Jacobsen* (1984), 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85; *United States v. Beale* (9th Cir. 1984), 736 F.2d 1289, 1292, *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

¶30    Using the drug package profile developed by the Postal Inspection Service, Inspector Morse detained the package in question in this case because (1) it was an Express Mail package and drug dealers often use the Express Mail service; (2) the label was handwritten rather than a typed business label; (3) all of the seams of the package were taped; (4) the zip code on the label did not match the zip code of where the package originated; (5) the package originated in Tucson, Arizona, a known drug distribution area; and (6) three other Express Mail packages had been delivered to the same address within the past six weeks. Consequently, we agree with the State that Inspector Morse did have a reasonable suspicion to detain the package.

¶31    Furthermore, because Inspector Morse's brief detainment of the package and his subjection of the package to a canine sniff at the nearby DEA office did not interfere with Ochadleus's possessory interest in the package, that brief detainment did not constitute a seizure under the Fourth Amendment. As the Ninth Circuit stated in *Hernandez*, "an addressee's possessory interest is in the timely delivery of the package, . . . ." *Hernandez*, 313 F.3d at 1210. Here, the canine sniff on Ochadleus's package and the subsequent delivery of that package were all done on the same day that Inspector Morse discovered the

13

package at the Post Office. Hence, Inspector Morse's brief detainment of the package to subject it to a canine sniff did not delay delivery.

¶32 Ochadleus also contends that even if his privacy interests under the Fourth Amendment were not invaded by the detention of his package, it does not necessarily follow that no privacy interests were invaded under Montana constitutional law. However, Ochadleus offers no real analysis or support for his state constitutional law claim. This Court has repeatedly held that it will not consider unsupported issues or arguments and is under no obligation to locate authorities or formulate arguments for a party in support of positions taken on appeal. *State v. Rodarte*, 2002 MT 317, ¶ 15, 313 Mont. 131, ¶ 15, 60 P.3d 983, ¶ 15 (citing *In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6).

¶33 Accordingly, we hold that Inspector Morse did have a reasonable suspicion to detain the package. We also hold that his brief detainment of the package to subject it to a canine sniff at the nearby DEA office was not a seizure under the Fourth Amendment because it did not interfere with Ochadleus's possessory interest in the package.

**Issue 2.**

¶34 *Whether the District Court properly denied Ochadleus's motion to suppress based on his claim that law enforcement officers failed to follow the "knock and announce" rule prior to executing a warrant to search his residence.*

¶35 Ochadleus argues in his brief on appeal that the law enforcement officers executing the warrant to search his residence should have knocked and announced their presence prior to entering the privacy of his home based on the Fourth Amendment to the United States

14

Constitution and the federal knock and announce statute. He also argues that because the officers failed to knock and announce, all evidence seized in the search of his home should be suppressed. The State argues, and we agree, that Ochadleus's rights under the Fourth Amendment and the federal knock and announce statute were not violated in this case because of the existence of exigent circumstances.

¶36 In our recent decision in *State v. Anyan*, 2004 MT 395, 325 Mont. 245, 104 P.3d 511, we addressed the knock and announce rule for the first time in Montana. In doing so, we noted in *Anyan* that the knock and announce rule recognizes the powerful protections afforded by the Fourth Amendment to the sanctity of the home and that the rule is intended to strike the proper balance between individual rights and the police power of the state. *Anyan*, ¶ 21 (citing *United States v. Becker* (9th Cir. 1994), 23 F.3d 1537; *People v. Condon* (Ill. 1992) 592 N.E.2d 951, *cert. denied*, 507 U.S. 948, 113 S.Ct. 1359, 122 L.Ed.2d 738 (1993)). We also noted that "[u]nderlying the knock and announce rule are concerns for the protection of privacy, reduction in the potential for violence, and the prevention of the destruction of property of private citizens." *Anyan*, ¶ 22 (citing *State v. Bamber* (Fla. 1994), 630 So. 2d 1048, 1052).

¶37 In evaluating the scope of the Fourth Amendment right to be free from unreasonable searches and seizures, the United States Supreme Court in *Wilson v. Arkansas* (1995), 514 U.S. 927, 931, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976, looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing of the Fourth Amendment. In doing so, the Supreme Court noted that

15

[a]lthough the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment. An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering.

*Wilson*, 514 U.S. at 931, 115 S.Ct. at 1916 (internal citations omitted).

¶38    The facts leading to the Supreme Court's holding in *Wilson* are these.  After Sharlene Wilson made several narcotics sales to an informant, law enforcement officers with the Arkansas State Police obtained warrants to arrest her and search her home.  The affidavit in support of the warrants stated that Wilson's housemate, Bryson Jacobs, had previously been convicted of arson and firebombing.  On the afternoon of the search, the officers found the main door to Wilson's home open.  As the officers opened an unlocked screen door and entered the residence, they identified themselves as police officers and stated that they had a warrant.  They found Wilson in the bathroom flushing marijuana down the toilet.  Wilson and Jacobs were arrested and charged with possession and distribution of marijuana and methamphetamine.  *Wilson*, 514 U.S. at 929-30, 115 S.Ct. at 1915-16.

¶39    Prior to trial, Wilson filed a motion to suppress the evidence seized during the search on various grounds including that the search was invalid because the officers failed to knock and announce their presence prior to entering the home. The trial court summarily denied the suppression motion.  Wilson was convicted on all charges and he appealed to the Arkansas Supreme Court arguing that the Fourth Amendment requires officers to knock and announce prior to entering a residence.  That court rejected Wilson's argument and affirmed her

conviction on appeal. The United States Supreme Court granted certiorari to resolve the conflict among the lower courts as to whether the common law knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry. The Supreme Court held that it did. *Wilson*, 514 U.S. at 930, 115 S.Ct. at 1916.

¶40    The Supreme Court further held in *Wilson* that not every entry must be preceded by an announcement. Rather,

> [t]he Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. . . . [T]he common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances.

*Wilson*, 514 U.S. at 934, 115 S.Ct. at 1918 (citing *Ker v. California* (1963), 374 U.S. 23, 38, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726).

¶41    Consequently, as we pointed out in *Anyan*, an officer serving a search warrant must comply with the knock and announce requirement unless there are exigent circumstances present which would present a threat of physical violence or the likelihood that evidence would be destroyed if the rule were not followed. *Anyan*, ¶ 33 (citing *United States v. Dupras* (D. Mont. 1997), 980 F.Supp. 344, 347; *Richards v. Wisconsin* (1997), 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615). There are two types of exigencies, those that are foreknown and those unexpected that arise on the scene. *Dupras*, 980 F.Supp. at 347. The determination of whether an unannounced entry is reasonable must be made under the particular circumstances of each case. *Dupras*, 980 F.Supp. at 347.

¶42    Exigent circumstances have been defined as

"those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."

*United States v. Zermeno* (9th Cir. 1995), 66 F.3d 1058, 1063 (quoting *United States v. McConney* (9th Cir. 1984), 728 F.2d 1195, 1199, *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)).

¶43   In *Richards v. Wisconsin* (1997), 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615, the United States Supreme Court held that to justify a no-knock entry, law enforcement officers must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.  Law enforcement officers obtained a warrant to search Richards' motel room for drugs and related paraphernalia.  One officer, dressed as a maintenance man, knocked on the door and stated that he was with maintenance.  With the chain still on the door, Richards cracked it open, but slammed it closed again when he saw a uniformed officer standing behind the "maintenance man."  After waiting two or three seconds, the officers kicked in the door.  They claimed at trial that they identified themselves as police as they were kicking in the door.  The officers caught Richards trying to escape through a window.  They found cash and cocaine hidden in plastic bags in the bathroom ceiling.  *Richards*, 520 U.S. at 388-89, 117 S.Ct. at 1418-19.

¶44 Richards sought to have the evidence from his motel room suppressed on the ground that the officers failed to knock and announce their presence prior to forcing entry into the room. The Supreme Court held that it was reasonable for the officers to believe that Richards knew, after he opened the door, that the men seeking entry into his room were the police and that once the officers reasonably believed that Richards knew who they were, it was reasonable for them to force entry immediately given the disposable nature of the drugs. *Richards*, 520 U.S. at 395, 117 S.Ct. at 1422.

¶45 As shown in *Richards*, the futility exception to the knock and announce rule excuses the knock and announce requirement where police officers have a reasonable suspicion that the occupants know of the presence and purpose of the police prior to their entry into the residence. *Anyan*, ¶ 51 (citations omitted). The Ninth Circuit Court of Appeals further addressed this exception to the knock and announce rule in *United States v. Peterson* (9th Cir. 2003), 353 F.3d 1045. Just before SWAT team members were ready to knock on Peterson's door to serve a search warrant, one of the occupants of the residence opened the door. Recognizing the group of people he saw on the porch to be police officers, he attempted to close the door as one of the officers shouted "Police, with a search warrant." The officers then forced the door open. On appeal, Peterson argued that the officers' entry into his residence was unreasonable under the Fourth Amendment. *Peterson*, 353 F.3d at 1047-48.

¶46 The Ninth Circuit concluded that the officers' no-knock entry was justified on the grounds of futility, destruction of evidence and danger. In addressing the issue of futility, the Ninth Circuit stated that

the SWAT team originally intended to announce its presence. However, just as this announcement was about to be made, [one of the occupants] unexpectedly opened the door, saw that police were outside, and attempted to deny them entry. Were we to hold that the police were required to announce their presence in this case and wait some further period of time while the occupants reconsidered whether to admit or resist them, it would amount to mandating a meaningless act. Announcement would have been futile. . . .

*Peterson*, 353 F.3d at 1049.

¶47    Like *Richards* and *Peterson*, the officers executing the search warrant in the case *sub judice* were seen by one of the occupants of the house before the officers had a chance to knock and announce, thus the futility exception to the knock and announce rule applies in this case. While Ochadleus, Wright and another male were sitting in the living room, Wright noticed someone pass by the window. When he went to the door to see who was there, he saw the officers through the window in the door. Even though Wright had already made eye contact with the officers, the officers still announced their presence. It was not until the officers saw Wright back away from the door instead of opening it, that the officers forced the door open. As the Ninth Circuit stated in *Peterson*, "[j]ust as one cannot close a door that is already closed, one cannot 'announce' a presence that is already known." *Peterson*, 353 F.3d at 1049.

¶48    Accordingly, we hold that the officers' forced entry into Ochadleus's home to execute the search warrant did not violate his Fourth Amendment right to be free from unreasonable searches and seizures.

¶49    By the same token, Ochadleus cannot successfully argue that the officers violated the federal knock and announce statute, 18 U.S.C. § 3109, which provides as follows:

20

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Because this rule "is more restrictive than the Fourth Amendment," *United States v. Tavares* (8th Cir. 2000) 223 F.3d 911, 916 n.5 (quoting *United States v. Moore* (8th Cir. 1992), 956 F.2d 843, 847), we analyze this argument separately.

¶50    While the Fourth Amendment's knock and announce reasonableness inquiry applies with equal force to both state and federal law enforcement officers, § 3109 does not directly apply to state law enforcement officers.  Rather, § 3109 applies "[w]hen federal officers are a significant part of a search conducted pursuant to a state warrant . . . ." *Tavares*, 223 F.3d at 914 (citations omitted).  In the present case, there was significant federal involvement to implicate the statute since Inspector Morse, who initiated the search, is a federal agent; the search warrants for both the package and the residence were issued by a federal magistrate; and the DEA was involved throughout the investigation including the search of the residence.

¶51    Ochadleus argues that the officers violated the knock and announce rule because they failed to knock.  However, as the District Court noted in its order denying Ochadleus's motion to suppress, although § 3109 is generally referred to as the "knock and announce" statute, it does not contain an express requirement that the officers actually knock on the door.  Rather, the statute requires that law enforcement officers give "notice of their authority and purpose."  Not only did the officers give notice of their authority and purpose in this case by announcing that they were the police and that they had a search warrant, but Wright saw

21

for himself through the window that they were police officers. It would have been futile for the officers to do more. "[E]xigent circumstances . . . apply with equal force in the § 3109 context." *Peterson*, 353 F.3d at 1051 (citing *United States v. Ramirez* (1998), 523 U.S. 65, 73, 118 S.Ct. 992, 998, 140 L.Ed.2d 191).

¶52 Section 3109 also requires that after giving notice of their authority and purpose and prior to forcing open the door, the officers must be refused admittance. Ochadleus argues that the District Court erred in interpreting Wright's step back as a refusal to admit the officers. However, we agree with the District Court's conclusion that it was reasonable for the officers to assume in this case that Wright's action of backing away from the door was a refusal to admit them.

¶53 Accordingly, we hold that the law enforcement officers' forced entry into Ochadleus's home to execute the search warrant did not violate § 3109.

## Conclusion

¶54 Because we hold that Inspector Morse's action of briefly detaining the package and taking it to the DEA office for a canine sniff did not constitute a seizure under the Fourth Amendment since it did not deprive Ochadleus of his possessory interest in the package, and because we hold that the officers' forced entry into Ochadleus's home to execute the search warrant did not violate his rights under the Fourth Amendment or the federal knock and announce statute, we affirm the District Court's denial of Ochadleus's motion to suppress.

¶55 Since this is only the second Opinion issued by this Court addressing the knock and announce rule in Montana, we believe that it is important to point out that this Opinion deals

22

with an exception to the knock and announce rule. To the end that law enforcement officers and prosecutors will not attach more significance to this Opinion than is justified, we re-emphasize the following well-established rules. The warrantless entry into a residence is *per se* unreasonable subject only to certain well delineated exceptions. *State v. Loh* (1996), 275 Mont. 460, 468, 914 P.2d 592, 597 (citing *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576). Officers serving a warrant to search a residence must knock and announce their presence before using force to enter the residence. *Anyan*, ¶ 33. The time the officers must wait before using force to enter the residence depends upon the circumstances of each case. *Anyan*, ¶ 64. The decision to make a no-knock entry into a residence should ordinarily be made by a neutral and detached magistrate as part of the application for a search warrant. This means that if the search warrant applicant knows of exigent circumstances which may justify a no-knock entry, those circumstances must be included in the application for the search warrant and the issuing magistrate will determine whether to allow the no-knock entry. *Anyan*, ¶ 63.

¶56 Finally, as in this case, an investigating officer may make a no-knock entry after a reasonable suspicion of exigency has ripened. *United States v. Banks* (2003), 540 U.S. 31, 124 S.Ct. 521, 157 L.Ed.2d 343. Exigent circumstances--i.e., those that typically are unexpected and that arise on the scene--include officer safety concerns, *Anyan*, ¶¶ 43-50; futility, *Anyan* ¶¶ 51-57; and the destruction of evidence, *Anyan* ¶¶ 58-60. We again stress, however, that a no-knock entry into a residence is the exception and not the rule.

¶57    Affirmed.


                                          /S/ JAMES C. NELSON


We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ BRIAN MORRIS

Justice W. William Leaphart specially concurring.

¶58    I concur in the Opinion of the Court. In doing so, however, I do not imply that I would accept the criteria of the so-called "drug package profile" as being sufficient to establish a reasonable suspicion. Here, the officer's reasonable suspicion was based on the following facts: (1) it was an express mail package; (2) the label was handwritten rather than a typed business label; (3) all of the seams of the package were taped; (4) the zip code on the label did not match the zip code of the city of origin; (5) the package originated in Tuscon, Arizona, a known drug distribution area; and (6) three other express packages had been delivered to the same address within the past six weeks.

¶59    But for the fact that we mail from Helena, Montana, rather than Tuscon, Arizona, the police, armed with these criteria, could dog-sniff every package that my wife and I mail to our daughters at college. Our packages, I should add, belie the validity of the profile. However, since Ochadleus has not challenged the significance or sufficiency of these criteria, either individually or in the aggregate, the package profile is not at issue in this case.


                                        /S/ W. WILLIAM LEAPHART